# In the United States Court of Federal Claims

## BID PROTEST

No. 14-1174C
(E-Filed Under Seal:  March 31, 2015)
(Redacted & Corrected Version Issued for Publication:  April 6, 2015)[1]

|  |  |
|---|---|
| PRECISE SYSTEMS, INC., | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) Bid Protest; Pre-Award; Small |
|  | ) Business Administration (SBA); |
| THE UNITED STATES, | ) Office of Hearings & Appeals (OHA); |
|  | ) Service-Disabled Veteran Owned |
| Defendant, | ) Small Business Concern (SDVO |
|  | ) SBC); Status; Ownership Criteria; |
| and | ) 15 U.S.C. § 632(q); 13 C.F.R. pt. 125; |
|  | ) 13 C.F.R. § 125.9(d); Remand |
| ALL POINTS LOGISTICS, LLC, and | ) |
| B3 SOLUTIONS, LLC, | ) |
|  | ) |
| Defendant-Intervenors. | ) |
|  | ) |

Kevin P. Mullen, Washington, DC, for plaintiff.  Damien C. Specht and Charles L. Capito, Washington, DC, of counsel.

---

[1]      The court originally issued this decision under seal on March 31, 2015 and invited the parties to propose redactions of any competition-sensitive, proprietary, confidential, or other protected information.  Plaintiff requested redaction of the percentages of stock held by the company's owners.  See Consent Mot. Redactions & Am./Correction, ECF No. 47.  Plaintiff also moved to correct the court's description, in Part I(A), infra, of the composition of the company's Board of Directors.  Id.  Defendant and the intervenors consented to these requests.  Id.  The court accepts the proposed redactions because good cause exists to protect the capitalization of plaintiff, a privately held company.  See also Protective Order, ECF No. 21, at ¶ 1 (defining "Protective Information" to include "information concerning Plaintiff's ownership and capitalization").  Redactions are indicated in this opinion by bracketed asterisks, "[***]," and by bracketed phrases, "[more than 51%]," "[less than 51%]," and "[more than 300,000]."  The court also corrects its description of the Board of Directors in Part I(A), infra.

Martin M. Tomlinson, Trial Attorney, Commercial Litigation Branch, with whom were Joyce R. Branda, Acting Assistant Attorney General, Robert E. Kirschman, Jr., Director, and Steven J. Gillingham, Assistant Director, Civil Division, United States Department of Justice, Washington, DC, for defendant.

Thomas K. David, Reston, VA, for defendant-intervenor All Points Logistics, LLC. Kenneth D. Brody, Reston, VA, of counsel.

Kathryn V. Flood, Washington, DC, for defendant-intervenor B3 Solutions, LLC. Pamela J. Mazza and Patrick T. Rothwell, Washington, DC, of counsel.

OPINION AND ORDER

CAMPBELL-SMITH, Chief Judge

Precise Systems, Inc. (Precise) was the apparent awardee on a Department of State solicitation entirely set aside for "service-disabled veteran-owned small business concerns" (SDVO SBCs). Four unsuccessful offerors filed agency protests resulting in a decision by the Small Business Administration (SBA), affirmed by its Office of Hearings and Appeals (OHA), that Precise was ineligible for SDVO SBC status and, therefore, also ineligible for the contract award. Precise challenges the ineligibility determination and seeks reinstatement as a SDVO SBC so that it may compete for this procurement and future procurements.

I.     Background

   A.     Precise's Organizational Structure

Precise Systems, Inc. is a small business in the aviation management and engineering services industry. Compl., Dec. 5., 2014, ECF No. 1, at ¶ 9. The company incorporated in 1990 under Maryland law. Id. at ¶¶ 9, 14; see AR[2] Tab 15 at 830 (Articles of Amend. & Restatement (Am. Art.), Nov. 30, 2012); Tr., Mar. 4, 2015, ECF No. 44, at 18:23–24.

Mr. John Thomas Curtis, a service-disabled veteran (SDV), was the sole owner of Precise until 2011, when he sold a minority interest in the company to an Employee Stock Ownership Plan (ESOP). Compl. ¶¶ 15–18; Curtis Aff., Jan. 22, 2015, ECF No. 30-1, at ¶¶ 2, 4. By sharing with his employees a minority interest in the company, Mr. Curtis hoped to reward his employees' contributions to the business and to promote

---

[2]     "AR ___" refers to the administrative record filed with the court in accord with R. Ct. Fed. Cl. (RCFC) 52.1(a).

retention and recruitment of talented staff, see AR Tab 11 at 138 (ESOP); Compl. ¶¶ 2, 19; Curtis Aff. ¶ 4, while still preserving his majority ownership and control of the company, see Curtis Aff. ¶ 8.

In January 2014, when Precise responded to the solicitation at issue here, Mr. Curtis held [more than 51%] of all issued shares, and the remaining [less than 51%] of issued shares were held by the ESOP.  See AR Tab 11 at 740–41.  Shares were divided and distributed between Series A Common Stock and Series B Convertible Preferred Stock.  AR Tab 15 at 830 (Am. Art., art. III(a)).  The corporation was authorized to issue (i) up to 1.2 million shares of Series A Common, of which [more than 300,000] shares had issued and were all held by the SDV Mr. Curtis; and (ii) up to 300,000 shares of Series B Convertible Preferred Stock, of which all had issued and were held by the ESOP.  Id.; Compl. ¶ 22; Tr. 7:21–24; see also Tr. 65:4–6 ("The ESOP is owned by a . . . larger number of the employees . . . .").

Each share, regardless of series, was entitled to one vote at shareholder meetings,[3] and "the powers, preferences[,] . . . qualifications, restrictions and limitations" of each share, regardless of series, were "identical," "[e]xcept as otherwise provided [in the Amended Articles]."  AR Tab 15 at 830 (Am. Art., art III(a)).  The Amended Articles, in turn, identified distinctions between Series A and Series B stock with respect to:  (1) dividend rights; (2) conversion rights; and (3) redemption rights.  See, generally, id. at 830–35.

First, with respect to dividend rights, the Amended Articles authorized five types of dividends, of which only one issued automatically and exclusively to the ESOP's Series B shareholders while the other four were optional at the election of the company (effectively, Mr. Curtis) and for the benefit of Series A, Series B, or both, as follows:

(1)   Series B Preferred Dividend—The ESOP's Series B shareholders were entitled to a cumulative preferential cash dividend at a rate of 5.5% on the face value of the Series B share price, payable no later than the last business day of each calendar year (the Preferred Dividend).  Id. at 831 (Am. Art., art. III(c)(1)(A)–(B)).  This Preferred Dividend was subordinate only to the Series A Repayment Dividend, next discussed.

---

[3]    See also AR Tab 11 at 615–16 (Am. & Restated Bylaws (Am. Bylaws), Nov. 30, 2012, at art III §§ 6, 8) (providing that each share, regardless of series, was entitled to one vote at any shareholder meeting, and further stating that a majority of issued shares constituted a quorum and "all Shareholder action shall be determined by a vote of the majority of the votes cast . . .  by [those] entitled to vote thereon").

(2)     Series A Repayment Dividend—The company (effectively, Mr. Curtis as the majority shareholder) could elect to declare and pay a cash dividend to the Series A shareholder (Mr. Curtis) in repayment for his conveyance of [less than 51%] percent interest in the company to establish the ESOP (the Repayment Dividend).  See id. at 830 (Am. Art., art. III(b)(i)).  This dividend was the only dividend that could issue before the Series B Preferred Dividend.  See id. at 831 (Am. Art., art. III(c)(1)(C)) (prohibiting any dividend to issue before the Series B Preferred Dividend "other than [a dividend] payable solely in Series A Common," i.e., the Repayment Dividend).

(3)     Series A Matching Dividend—"Upon payment of the [Series B Preferred Dividend], the holder[] of the Series A Common [Mr. Curtis] [was also] entitled to receive a dividend per share . . . equal to and at the same time and in the same manner as [the Series B] Preferred Dividend" (the Matching Dividend).  Id. at 835 (Am. Art., art. III(d)).

(4)     Series B Additional Dividend—After the Series B Preferred Dividend has issued, the company (effectively Mr. Curtis, as the majority shareholder) could also elect to pay additional cash dividends to the ESOP's Series B shareholders (the Series B Additional Dividend).  Id. at 831 (Am. Art., art. III(b)(ii)).

(5)     Universal Dividend—Likewise, after the Series B Preferred Dividend has issued, the company (effectively Mr. Curtis, as the majority shareholder) could elect to pay additional cash dividends to all shareholders, regardless of series, equally per share (the Universal Dividend).  See id (Am. Art., art III(b) (last sentence)).

See also Tr. 23:5–25:2, 25:10–26:2 (explaining dividend provisions).[4]

Second, differences between Series A and Series B also existed with respect to conversion rights.  Any Series B shareholder could elect, at any time, to convert his or her Series B shares into Series A shares, on a one-to-one basis.  AR Tab 15 at 831 (Am. Art., art. III(c)(2)).  However, the Series A shareholder (Mr. Curtis) did not enjoy a reciprocal right to convert his Series A shares to Series B shares.  See id.

---

[4]     The Amended Articles only assigned a shorthand reference ("Preferred Dividend[s]") to the Series B preferred dividend(s), but did not assign a shorthand reference to any of the other four dividends.  For ease of reference in this opinion, the court has given those other dividends shorthand references as well:  the "Repayment Dividend," the "Matching Dividend," the "Series B Additional Dividend," and the "Universal Dividend."

Third, with respect to redemption rights, the company was "entitled to redeem [buy back] the Series B Convertible Preferred, in whole or in part, at the election of a majority of the holders of Series A Common voting as a single class," beginning on or after December 31, 2017, and on an annual basis thereafter. Id. at 833 (Am. Art., art. III(c)(3)). However, there was no corresponding right to redeem Series A shares at any time. See id.

In addition, although not a dissimilarity between Series A and Series B stock, it bears noting that the company's Amended Articles ensured the service-disabled veteran's representation and enhanced power on the Board of Directors, relative to other shareholders. The Board was comprised of a "Class A Director" who was the majority shareholder (Mr. Curtis) and "Class B Director(s)" elected by a majority of all shareholders (limited to six individuals, but filled by only four). Id. at 836 (Am. Art., art. VI); AR Tab 11 at 616 (Am. & Restated Bylaws (Am. Bylaws), Nov. 30, 2012, at arts. III § 20); see also Tr. 65:6–9. As the Class A Director, Mr. Curtis was "entitled to exercise seven (7) votes on any matter before the Board of Directors or any [of its] committees," whereas the Class B Directors were each "entitled to one (1) vote [apiece on any of the same matters]." AR Tab 15 at 836 (Am. Art., art. VI). Mr. Curtis was also Chairman of the Board, AR Tab 11 at 653, and had the power to elect and remove Board members with or without cause, AR Tab 11 at 616, 618 (Am. Bylaws, arts. III §§ 2, 14, 15).

Despite the distinctions on the Board of Directors and between Series A and Series B rights, privileges, and obligations, Mr. Curtis retained direct and unconditional majority ownership and control over the company at all times and under all circumstances. For example, there does not appear to be any matter on which Series B shareholders voted exclusively. Rather, Series A and Series B appear to have voted together on every matter requiring shareholder approval, and in each such instance Mr. Curtis, as the majority shareholder, could always out vote the Series B shareholders. Series B stock was limited to a total issuance of 300,000 shares, which was less than [***] of the [more than 300,000] Series A shares issued to Mr. Curtis and less than [***] of the total 1,200,000 Series A shares that could issue to Mr. Curtis. Even if every ESOP Series B shareholder exercised his or her right to convert all of the Series B stock to Series A stock, Mr. Curtis would still own more than 51% of the total issued stock. Likewise, even if the company redeemed all of the ESOP's Series B stock, the ESOP effectively would disappear and all of the remaining issued stock would be in the form of Series A and held exclusively by Mr. Curtis. Similarly, Mr. Curtis' weighted voting power on the Board of Directors ensured that he retained complete control over all of the Board's decisions. Likewise, Mr. Curtis, as Chief Executive Officer of the company, AR Tab 11 at 653, and majority shareholder, had the power to appoint and remove the company's other officers, with or without cause and at any time, AR Tab 11 at 619–20 (Am. Bylaws, art. IV §§ 1–5).

Thus, as a result of Mr. Curtis' majority ownership and position, he controlled all matters requiring shareholder or Board approval as well as the management of the company.  There was no circumstance in which the minority Series B shareholders or the Class B Directors could either overcome Mr. Curtis' position on any issue or vote to prohibit Mr. Curtis from accomplishing any lawful purpose.  The affirmative and negative powers of ownership and control rested exclusively, directly, and unconditionally with Mr. Curtis, the SDV.

B.    Solicitation and Protests

In January 2014, Precise responded to the Department of State's Solicitation No. SAQMMA-13-R-044, for aviation-related program support services for the eradication and interdiction of illicit drugs.  See Compl. ¶¶ 10, 26–28; AR Tab 15 at 797 (solicitation excerpt at § B-1); see also Tr. 10:13–16 (noting "[t]he ceiling price of that 10-year contract was $240 million, so a sizeable business opportunity").  As the procurement was set aside solely for SDVO SBCs, see AR Tab 15 at 797, Precise's response would have included a self-certification of SDVO SBC status as required by 13 C.F.R. § 125.15(a)(1) (2013).  About six months later, the Department of State selected Precise as the apparent awardee from among fifteen SDVO SBC offerors.  See AR Tab 15 at 872 (SBA Notice, total award price $134 million).

Four unsuccessful offerors filed protests with the contracting officer.  See AR Tab 15 at 826–28, 845–48, 883–88, Tab 14 at 773–74, Tab 15 at 791–93 (four protests).  The protests claimed that Precise was not a valid SDVO SBC because it was not "owned" and "controlled" by a "service-disabled veteran," as those terms are defined by the Small Business Act of 1958, as amended and as codified in relevant part at 15 U.S.C. § 632(q) (2012), and by the SBA regulations for government contracting programs, 13 C.F.R. pt. 125 (2013).[5]  See, generally, id.  The contracting officer forwarded the protests to the SBA's Acting Director of Government Contracting (AD/GC) for review.  See AR Tab 15 at 785–88, 820–21, 822–23 (protest referrals).  Precise responded and included

---

[5]    An unsuccessful offeror(s) also challenged whether Precise was "small" under the procurement's North American Industry Classification System (NAICS) code 541330 (Engineering Services) and accompanying size standard for Military and Aerospace Equipment and Military Weapons (MAE&MW) of $35.5 million annual receipts.  See Tr., Mar. 4, 2015, ECF No. 44, at 11:13–13:1 (discussing size protests).  On review, the Small Business Administration (SBA) Office of Hearing and Appeals (OHA) confirmed that the solicitation employed an appropriate NAICS code and an appropriate size standard, relative to which Precise qualified as "small."  Size Appeal of U.S. Dep't of State & Precise Sys., Inc., SBA No. SIZ-5627, 2014 WL 7640937 (Dec. 23, 2014); see, generally, 13 C.F.R. §§ 125.25(a), 121.1001–.1103 (2013) (small business size eligibility protest procedures).

documentation in support of its SDVO SBC eligibility.  See AR Tab 10 at 94–114, Tab 11 at 115–745 (Precise's responses).

C.      AD/GC Determination

On September 10, 2014, the AD/GC sustained the protests, finding that Precise was not a SDVO SBC at the time of its offer and thus was ineligible to bid on or receive the protested procurement.[6]  See AR Tab 8 at 77–84 (AD/GC determination).  The AD/GC found that while Mr. Curtis qualified as a "service-disabled veteran" under 15 U.S.C. § 632(q)(1) and 13 C.F.R. § 125.8(f), he failed to satisfy the regulatory requirements for ownership due to his shared interest with the ESOP.  Id. at 79–80.

The applicable SBA regulation for ownership criteria requires:

A concern must be at least 51% unconditionally and directly owned by one or more service-disabled veterans.  More specifically:

. . . .

(d) . . . .  In the case of a concern which is a corporation, at least 51% of the aggregate of all stock outstanding and at least 51% of each class of voting stock outstanding must be unconditionally owned by one or more service-disabled veterans.

13 C.F.R. § 125.9(d) (emphasis added).

That Mr. Curtis unconditionally and directly owned [more than 51%] of the aggregate of all issued shares was undisputed.  AR Tab 8 at 79.  What was (and still is) in dispute is whether he owned "51% of each class of voting stock outstanding."  See id. at 79–80.  As further discussed below, resolution of this dispute hinges on what constitutes a "class of voting stock" for purposes of the regulation.

Precise argued that the Series A Common Stock and Series B Convertible Preferred Stock were not separate classes of stock but merely two different "series" within a single "class."  Id.  Precise reasoned that the shares of Series A and Series B stock were identical in terms of voting power—each share had one vote; the shares voted together on all issues; and the differences between the shares were not material to voting power or control.  Id.  The AD/GC rejected Precise's rationale, observing that the two

---

[6]      The AD/GC issued separate determination letters to each of the four protestors, but the letters were substantively identical.  See AR Tab 8 at 61–68, 69–76, 77–84, 85–92.  For ease of reference, the court cites to only one.  See id. at 77–84 (AD/GC determination).

series were "not functionally equivalent"[7] because:  (i) each series had "separate voting rights on at least one issue," such as declaring and paying dividends; and (ii) Series B Convertible Preferred shareholders enjoyed a preferential dividend unavailable to the Series A Common shareholder.  Id. at 80.  The AD/GC then further reasoned that because Series A and Series B were not "functionally equivalent," they qualified as separate "class[es] of voting stock" such that Mr. Curtis was required to own "at least 51%" of each series.  Id. (applying 13 C.F.R. § 125.9(d)).  However, since Mr. Curtis owned only Series A Common Stock and no Series B Convertible Preferred Stock, the AD/GC ultimately concluded that Mr. Curtis failed to satisfy § 125.9(d)'s ownership criteria.  Id. at 80.

The AD/GC then considered whether Mr. Curtis held sufficient "control" over Precise to satisfy 13 C.F.R. § 125.10.  Id. at 80–81.  He concluded that Mr. Curtis met each element of the SBA's regulatory test for "control" because Mr. Curtis:  (i) controlled the management and daily business operations of the concern; (ii) held the highest officer position in the concern (here, Chief Executive Officer); (iii) possessed the requisite managerial experience needed to run the concern; (iv) was a member of the Board of Directors; and (v) held sufficient ownership interest to overcome any supermajority voting requirement.  Id. at 81.  Although the AD/GC identified no defects in Mr. Curtis' control, the AD/GC nevertheless concluded without explanation:  "[F]or all the foregoing reasons, I must conclude that a service-disabled veteran [did] not control Precise as required by 13 C.F.R. § 125.10."  Id.

Mr. Curtis' purported lack of ownership and control led the AD/GC to determine that Precise was not a SDVO SBC at the time of its offer, and therefore was not eligible to bid on either the protested solicitation or on any future solicitations set aside for SDVO SBCs.  Id.

D.    Appeal to the SBA's OHA

The SBA's Office of Hearing and Appeals subsequently denied Precise's appeal and affirmed-in-part the AD/GC's determination that Precise did not meet the eligibility

---

[7]    The AD/GC did not explain why he employed a "functional equivalency" standard when assessing the shares.  But the court notes that the standard closely mirrors the SBA's rationale for excepting certain "living trusts" from 13 C.F.R. § 125.9(a)'s requirement that ownership must be "direct" rather than through an intervening entity:  "[L]iving trusts may be treated as the functional equivalent of ownership by service-disabled veterans where the trust is revocable, and the service-disabled veterans are, at all times, the grantors, trustees, and the current beneficiaries of the trust."  70 Fed. Reg. 14,523 (eff. March 23, 2005) (emphasis added).

requirements for SDVO SBC status at the time of its offer.[8]  AR Tab 20 at 922–34 (In the Matter of: Precise Sys., Inc., SBA No. VET-243, 2014 WL 6708827 (Nov. 6, 2014) (OHA decision)).  On appeal, Mr. Curtis's status as a "service-disabled veteran" was not challenged.  Id. at 923 n.2.  The OHA and the parties also agreed that the AD/GC plainly erred in concluding that Mr. Curtis lacked "control" of the company; the AD/GC's erroneous finding was "a complete non sequitur based on the findings preceding it," which plainly demonstrated that Mr. Curtis satisfied "control" criteria in 13 C.F.R. § 125.10.  Id. at 931 (contemplating "the AD/GC may have committed typographical errors").  For the OHA, the only issue on appeal was "whether the AD/GC clearly erred in determining that Series A Common Stock and Series B Convertible Preferred Stock are different 'classes' of stock for purposes of 13 C.F.R. § 125.9(d)."  Id. at 930.

The OHA began its analysis of ownership criteria with reference to the second prong of Section 125.9(d), requiring that the service-disabled veteran own "at least 51% of each class of voting stock outstanding."  Id.  Noting first that SBA regulations are "silent as to what constitutes a 'class'" as well as how to "distinguish a 'class' from a 'series,'" the OHA turned for guidance to Maryland law under which Precise was incorporated.  "Maryland's Corporations and Associations Code provides that '[i]f the stock is divided into classes,' the corporation's articles of incorporation must include 'a description of each class including any preferences, conversion and other rights, voting powers, restrictions, limitations as to dividends, qualifications, and terms and conditions of redemption.'"  Id. (quoting Md. Code Ann., Corps. & Ass'ns § 2-104(a)(7) (West 2013)).  Based on this provision, the OHA reasoned that "although voting rights are a relevant consideration, the boundaries of a 'class' may also be defined by factors such as preferential dividends, redemption abilities, and conversion rights."  Id. at 930.  The OHA therefore concluded the AD/GC had a rational basis for viewing Series A and Series B as potentially different classes based on their different dividend rights.  Id. at 931.

Further, the OHA determined it was not error for the AD/GC to reject Precise's alternative view that "different groups of stock are different classes only if they have dissimilar voting rights" because Precise was merely "seek[ing] to substitute its own [narrower] interpretation of the regulation for that of the AD/GC['s] [broader interpretation]."  Id. at 930.

The OHA also concluded the AD/GC did not err in ultimately determining—based on a broad range of considerations beyond "voting rights"—that the Series A and Series B shares at issue here were "sufficiently dissimilar" to warrant treatment as separate classes.  Id. at 931.  The OHA reasoned that "Series B shareholders may receive

---

[8]     For briefing before the OHA, see AR Tab 1 at 1–39 (Precise's appeal), Tab 5 at 47–55 (SBA's response), Tab 17 at 903–10 (All Points Logistics, LLC's response), Tab 18 at 911–13 (B3 Solutions, LLC's response), Tab 19 at 914–21 (Precise's reply).

cumulative preferential dividends before Series A shareholders do, and have conversion rights unavailable to Series A holders." Id. (citing Am. Art., art. III(c)(1)(C), (c)(2)). "Series A and Series B also have different redemption rights." Id. (citing Am. Art., art. III(c)(3)). But the OHA did not identify a source for its "sufficiently dissimilar" standard, nor how its standard might be the same as, or vary from, the AD/GC's "functional equivalency" standard. See AR Tab 20 at 923; see also supra n.7.

The OHA rejected Precise's warning that an affirmance of the AD/GC determination would create inconsistencies with the SBA's 8(a) Business Development (BD) program and the Department of Veterans Affairs (VA) program for SDVO SBCs. Id. The SBA's 8(a) BD program imposes a similarly-worded ownership requirement, see 13 C.F.R. § 124.105(d) (2013), but, according to the OHA, its own precedent interpreting that similar requirement was "flawed" and therefore need not be followed here,[9] see AR Tab 20 at 931. Nor must the SBA follow the VA's approach, the OHA reasoned, because the VA's program promoting SDVO SBC contracting opportunities "is a separate program from that of the SBA, and it specifically exempts ESOPs" from the ownership calculation. Id. (citing VA regulation, 38 C.F.R. § 74.3(a) (2013)). Lastly, the OHA acknowledged Precise's concerns that the AD/GC's determination is "poor policy" as it would "discourage other, would-be SDVO SBCs from creating ESOPs," but the OHA observed that it "has no authority to determine the propriety of the regulations themselves." Id.

Because the OHA could find "no clear error" in the AD/GC's reasoning or conclusion that Precise's service-disabled veteran, Mr. Curtis, lacked sufficient ownership to satisfy 13 C.F.R. § 125.9, it affirmed the AD/GC's determination that Precise was not an SDVO SBC at the time of its offer. Id. at 931–32.

E.     Appeal to this Court

Precise responded to the OHA decision by filing a pre-award bid protest in this court, arguing the OHA decision was "arbitrary, capricious, lacked a rational basis, and contrary to law." Compl. ¶ 1. Shortly thereafter, and with no objections from the parties, the court permitted two of the unsuccessful offerors—All Points Logistics, LLC (All Points or APL) and B3 Solutions, LLC (B3)—to intervene as interested parties. See Order, Dec. 29, 2014, ECF No. 13; Order, Jan. 8, 2015, ECF No. 22.

Whether Precise satisfied the SBA's statutory and regulatory criteria for ownership by a service-disabled veteran is the sole focus of this court's review and the only remaining obstacle to Precise's eligibility as a SDVO SBC. Following oral

---

[9]     The OHA concluded that it could ignore its precedent in the context of the 8(a) BD program because it was based on the "flawed premise that voting rights are the only possible distinguishing characteristic of a class of stock." AR Tab 20 at 931.

argument on the parties' cross-motions for judgment on the administrative record,[10] the issue is ripe for decision.  The Department of State has agreed to stay award and performance of the contract pending resolution of the protest.  Compl. ¶ 55.

II.     Jurisdiction

This court's bid protest jurisdiction includes the authority "to render judgment on an action by an interested party objecting [1] to a solicitation . . . or [2] to a proposed award or the award of a contract or [3] [to] any alleged violation of statute or regulation in connection with a procurement . . . [,] without regard to whether suit is instituted before or after the contract is awarded."  28 U.S.C. § 1491(b)(1) (2012) (emphasis added).  As explained by the Federal Circuit, jurisdiction premised on the third prong of § 1491(b) "does not require an objection to the actual contract procurement . . . .  The operative phrase 'in connection with' is very sweeping in scope.  As long as a statute has a connection to a procurement proposal, an alleged violation suffices to supply jurisdiction."  RAMCOR Servs. Grp., Inc. v. United States, 185 F.3d 1286, 1289 (Fed. Cir. 1999); see also Sys. Application & Techs., Inc. v. United States, 691 F.3d 1374, 1380–81 (Fed. Cir. 2012) (explaining the Court of Federal Claims has the authority to review, inter alia, "objections related to a statutory or regulatory violation so long as these objections are in connection with a procurement").

Plaintiff alleges that the SBA violated 13 C.F.R. § 125.9, a regulation setting a standard by which the SBA determines SDVO SBC eligibility for procurement set-asides.  As contemplated by the third prong of § 1491(b)(1), the court finds this "alleged violation . . . of regulation" is "in connection with a procurement."  The regulation at issue is part of a comprehensive administrative regime in Parts 125 and 134 of the Code of Federal Regulations, governing bid protests by interested parties to a procurement who seek to challenge an apparent successful offeror's SDVO SBC eligibility under § 125.24(b).  See Protests Concerning SDVO SBCs, 13 C.F.R. §§ 125.24–.28 (2013); Appeals from SDVO SBC Protests, 13 C.F.R. §§ 134.501–.515 (2013); see also FAR 19.1403 (2013) (incorporating 13 C.F.R. § 125.9 as the standard for determining SDVO SBC status in federal procurements generally).

---

[10]     On January 22, 2015, plaintiff Precise Systems, Inc. moved for judgment on the administrative record, see ECF No. 30 (Pl.'s MJAR), to which defendant United States responded and cross-moved for judgment on the administrative record, see ECF No. 33 (Def.'s MJAR), as did defendant-intervenors All Points Logistics, LLC, see ECF No. 32 (APL's MJAR), and B3 Solutions, LLC, see ECF No. 34 (B3's MJAR); ECF No. 35 (B3's Mem.).  In turn, all parties then filed further responses/replies.  See ECF Nos. 37 (Pl.'s Reply), 38 (APL's Reply), 39 (Def.'s Reply), 40 (B3's Reply).  The court also held oral argument.  See Tr., Mar. 4, 2015, ECF No. 44.

Here, four unsuccessful offerors invoked these bid protest procedures, §§ 125.25(a)–(d), 125.26(b), to challenge Precise's SDVO SBC status after the contracting officer selected Precise as the apparent awardee. The protests were filed with the contracting officer, who forwarded the protests for decision to the SBA in accordance with § 125.25(c) and (e). As a direct result of these protests, the SBA's AD/GC had occasion to apply (or allegedly misapply) the SDVO SBC eligibility regulation to Precise, and to issue its final determination under § 125.27 finding Precise ineligible. Precise then invoked its right as the "protested concern" to appeal the AD/GC's determination to the OHA in accord with § 134.502. Once the OHA affirmed the AD/GC's determination, the OHA's decision became effective immediately and bound the contracting officer to exclude Precise from the subject procurement. See id. § 125.27(g)(2)(iii). But for the protests and the SBA's subsequent alleged misapplication of § 125.9, Precise likely would have received the award. Stated another way, Precise's only obstacle to the contract award is the SBA decision rendered in the course of the procurement. It would appear, therefore, that Precise's allegations properly invoke this court's bid protest jurisdiction under the third prong of 28 U.S.C. § 1491(b)(1).

No reported opinions confirm this court's authority to review an SBA decision where, as here, the SBA has deemed an apparent awardee ineligible for SDVO SBC status in the context of an ongoing procurement. Such a decision, however, is a "final agency decision." See 13 C.F.R. § 134.515(a). As such, not only would it be subject to the "normal presumption in favor of judicial review" like any other final agency action, but the court is not aware of any statute or legislative history counseling against application of the presumption to the final decision at issue in this case. See Cavalier Clothes, Inc. v. United States, 810 F.2d 1108, 1112 (Fed. Cir. 1987) (citations omitted); Related Indus., Inc. v. United States, 2 Cl. Ct. 517, 520–21 (1983) ("The text or legislative history of a statute must provide 'clear and convincing' evidence of congressional intent . . . before a statute will be construed to restrict access to judicial review.") (citation omitted).

Having found the decision subject to judicial review, this court further finds that, under the facts of this case, this court is an appropriate forum to engage in the review. This court has repeatedly exercised jurisdiction over other SBA decisions made in the context of a procurement. E.g., Arcata Assocs., Inc. v. United States, 110 Fed. Cl. 290, 295 (2013) (holding that a "[contracting officer's] initial [NAICS code] designation and [the] OHA's decision rejecting that designation . . . are both 'in connection with' a proposed ongoing procurement" (quoting 28 U.S.C. § 1491(b)(1))); Mark Dunning Indus., Inc. v. United States (Mark Dunning II), 60 Fed. Cl. 687, 689, 693 (2004) (remanding to the SBA for reconsideration of an Historically Underutilized Business Zone (HUBZone) qualification protest); Ceres Envtl. Servs., Inc. v. United States, 52 Fed. Cl. 23, 24 (2002) (remanding to the SBA for redetermination on the correct size standard to apply to a solicitation under SBA's regulations); cf. AmBuild Co., LLC v. United States, 119 Fed. Cl. 10, 13–14, 17–18 (2014) (exercising jurisdiction over the

VA's final decision cancelling a contractor's SDVO SBC status where the decision was made after the contractor was recognized as apparent lowest offeror on VA procurement and the second-lowest offeror filed a status protest).[11]

In the course of some of these challenges, defendant has even conceded this court's jurisdiction.  E.g., Advanced Sys. Tech., Inc. v. United States, 69 Fed. Cl. 474, 481 (2006) (quoting the government's concession that "the Court possesses jurisdiction to consider determinations of the [SBA] that affect the award of a contract to an interested party" (citation to briefing omitted)); Chapman Law Firm v. United States, 63 Fed. Cl. 25, 30 (2004) (quoting the government's concession that the phrase "in connection with" is "sufficiently broad to encompass agency action that is delegated by the [procuring] agency to another agency for purposes of making a[n] [award] determination" (citation to trial transcript omitted)).

Accordingly, this court's jurisdiction, under the third prong of 28 U.S.C. § 1491(b)(1), encompasses authority to review an SBA decision deeming an apparent awardee ineligible for SDVO SBC status in the context of an ongoing procurement.

III.    Bid Protest Standard of Review

The court will review the SBA's decision subject to "the standards set forth in section 706 of title 5 [of the Administrative Procedure Act]," 28 U.S.C. § 1491(b)(4), which permit the court to set aside the SBA's decision only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A) (2012); accord Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005);

---

[11]    The Federal Circuit also has recognized this court's jurisdiction over similar SBA decisions under earlier versions of this court's jurisdictional authority premised on then-existing 28 U.S.C. §§ 1491(a)(1) and (a)(3).  See Cavalier Clothes, Inc. v. United States, 810 F.2d 1108, 1111–12 (Fed. Cir. 1987) (holding the Claims Court had jurisdiction over the SBA's refusal to grant a certificate of competency to a small business contractor in connection with its bid on a contract to manufacture coats); Electro-Methods, Inc. v. United States, 728 F.2d 1471, 1475 (Fed. Cir. 1984) (holding the Claims Court could exercise jurisdiction over an offeror's suspension by the SBA because "the effect of that suspension was (or would have been) to cause [the contractor] to lose the award of contracts on which it had already bid and on which it was, at least in some instances, low [offeror]"); cf. Related Indus., Inc. v. United States, 2 Cl. Ct. 517, 519–21 (1983) (holding the Claims Court had jurisdiction to review the propriety of a rejection of a contractor's low bid following the SBA's adverse final disposition on a contractor's competency).  Subsequently, the Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320, §§ 2(a), 12(b), 110 Stat. 3870, 3874 (1996) amended the Tucker Act, 28 U.S.C. § 1491, to establish an explicit statutory basis for bid protest jurisdiction in this court by adding a new sub-section (b) to then existing § 1491.

Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1057 (Fed. Cir. 2000).
Stated another way, a disappointed offeror must show, by a preponderance of the
evidence, see Hunt Bldg. Co., Ltd. v. United States, 61 Fed. Cl. 243, 269 (citations
omitted), modified on other grounds by 63 Fed. Cl. 141 (2004), either that the decision:
(1) "lacked a rational basis;" or (2) "involved a violation of regulation or procedure,"
Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1351 (Fed. Cir. 2004) (quoting
Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332
(Fed. Cir. 2001)).  In addition, the protestor must show that it was prejudiced by the error
in the procurement process.  Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365,
1367 (Fed. Cir. 1999) (citing Statistica, Inc. v. Christopher, 102 F.3d 1577, 1581 (Fed.
Cir. 1996); Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996)).

When a challenge is premised on a lack of rational basis, the reviewing court
should inquire whether the agency's decision "was legally permissible, reasonable, and
supported by the facts."  ViroMed Labs, Inc. v. United States, 62 Fed. Cl. 206, 212
(2004) (citing Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29,
43 (1983)).  An agency's determination lacks a rational basis if it "relied on factors which
Congress ha[d] not intended it to consider, entirely failed to consider an important aspect
of the problem, offered an explanation for its decision that runs counter to the evidence
before the agency, or is so implausible that it could not be ascribed to a difference in view
or the product of agency expertise."  Nat'l Ass'n of Home Builders v. Defenders of
Wildlife, 551 U.S. 644, 658 (2007) (quoting Motor Vehicle Mfrs., 463 U.S. at 43); see
also In re Sang Su Lee, 277 F.3d 1338, 1342 (Fed. Cir. 2002) ("[T]he agency tribunal
must present a full and reasoned explanation of its decision . . . set[ting] forth its findings
and the grounds thereof, as supported by the agency record, and explain[ing] its
application of the law to the found facts.");  Humane Soc. of U.S. v. Clinton, 236 F.3d
1320, 1324–25 (Fed. Cir. 2001) (explaining the agency must "consider[] the relevant
factors and articulate[] a rational connection between the facts found and the choice
made" (quoting Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc., 462 U.S.
87, 105 (1983)));  Impresa Construzioni, 238 F.3d at 1333 (explaining the agency must
provide "a coherent and reasonable explanation of its exercise of discretion" (quoting
Latecoere Int'l, Inc. v. United States Dep't of Navy, 19 F.3d 1134, 1356 (11th Cir.
1994))).  "[A] court," however, "is not to substitute its judgment for that of the agency."
Motor Vehicle Mfrs., 463 U.S. at 43.

When a challenge is premised on a violation of law, the protestor must show "a
clear and prejudicial violation of applicable statutes and regulations."  Centech Grp., Inc.
v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (quoting Impresa Construzioni,
238 F.3d at 1333).

If the court finds prejudicial error on either ground, the court "may award any
relief that the court considers proper, including declaratory and injunctive relief except
that any monetary relief shall be limited to bid preparation and proposal costs."  28

U.S.C. § 1491(b)(2).  "The court also has 'the power to remand appropriate matters to any administrative or executive body or official,' including the SBA, 'with such direction as it may deem proper and just.'"  Mark Dunning Indus., Inc. v. United States (Mark Dunning I), 58 Fed. Cl. 216, 220 (2003) (quoting 28 U.S.C. § 1491(a)(2); Y.S.K. Constr. Co. v. United States, 30 Fed. Cl. 449, 459 (1994)).

IV.   Discussion

    A.   Statutory and Regulatory Framework

Within SBA programs, a "small business concern owned and controlled by service-disabled veterans" (SDVO SBC) is defined, first and foremost, by Congress as "a small business concern":

> (A)   not less than 51 percent of which is owned by one or more service-disabled veterans . . . ; and

> (B)   the management and daily business operations of which are controlled by one or more service-disabled veterans . . . .

15 U.S.C. § 632(q)(2).[12]  Notably absent from this statutory definition is any mention of a subsidiary requirement that the SDV also own "at least 51% of each class of voting stock."  The SBA later imposed this subsidiary requirement through a regulation titled "Who Does SBA Consider to Own an SDVOSBC," which states:

> A concern must be at least 51% unconditionally and directly owned by one or more service-disabled veterans.  More specifically:

> . . . .

> (d) . . . .  In the case of a concern which is a corporation, at least 51% of the aggregate of all stock outstanding and at least 51% of each class of voting stock outstanding must be unconditionally owned by one or more service-disabled veterans.

---

[12]   This definition of SDVO SBC was adopted by the Veterans Entrepreneurship and Small Business Development Act of 1999, Pub. L. 106-50, Title I, § 103(a), 113 Stat. 234, 243, which amended then-existing 15 U.S.C. § 632 of the Small Business Act, as amended, to add the definition of SDVO SBC in a new sub-section (q).

13 C.F.R. § 125.9(d) (emphasis added); <u>but</u> <u>cf.</u> <u>id.</u> § 125.8(g)(1) (mentioning only the aggregate ownership requirement); <u>id.</u> § 125.26(b) (same).[13]

There are no definitions of "class" or "voting stock" in the statute or 13 C.F.R. pt. 125. Nor are the terms defined in the Federal Register's publication of § 125.9 either as an interim final rule, 69 Fed. Reg. 25,262 (proposed May 5, 2004), or as a final rule, 70 Fed. Reg. 14,523 (eff. Mar. 23, 2005).[14] The SBA does explain in the Federal Register that its newly adopted 13 C.F.R. § 125.9 was intended to provide "guidance on the ownership criteria of a service-disabled veteran-owned SBC . . . [specifically] that ownership must be direct and that stock options are given present effect when they are held by non-service disabled veterans . . . consistent with SBA's other programs, including the 8(a) Business Development Program." 69 Fed. Reg. at 25,263.

Neither the SBA nor a court has had occasion to interpret § 125.9's phrase "each class of voting stock" in a reported decision. However, the OHA has interpreted a materially identical ownership requirement in the context of the SBA's 8(a) BD program, <u>see</u> 13 C.F.R. pt. 124 (2013), which conditions eligibility for that program on a "socially and economically disadvantaged individual" owning "at least 51 percent of each class of voting stock" as well as 51% of all issued shares. <u>See</u> <u>In the Matter of:  Precision Analytical Lab., Inc.</u>, SBA No. 384, 1991 WL 540468, at *1 (Nov. 4, 1991) (interpreting 13 C.F.R. § 124.103 (1989), now at 13 C.F.R. § 124.105(d)).

In <u>Precision</u>, the "socially and economically disadvantaged individual," upon whom eligibility was based, owned 51% of the company's Class A Common Stock and

---

[13]      For purposes of this opinion, the court assumes the regulations are duly promulgated exercises of SBA authority, valid and enforceable. It is "well-settled" that the OHA has no authority to strike down an SBA regulation as invalid. <u>See, e.g.</u>, <u>Size Appeal of Rich Chicks, LLC</u>, SBA No. SIZ-5556, 2014 WL 2417635, at *7 (May 12, 2014). Similarly, challenges to the validity of a regulation are properly brought to district court. <u>See</u> <u>Southfork Sys., Inc. v. United States</u>, 141 F.3d 1124, 1135 (Fed. Cir. 1998) ("If [an offeror] wishes to challenge the validity of a regulation governing a procurement, the proper method of doing so is to bring an action in federal district court under the Administrative Procedure Act, 5 U.S.C. § 702.") (citations omitted).

[14]      In the interim final rule, the SBA stated that the purpose of the rule was to "implement[] that section of the recently enacted Veterans Benefits Act of 2003 (VBA), [codified at 15 U.S.C. § 657f] [,] which addresses procurement programs for small business concerns (SBCs) owned and controlled by service-disabled veterans." 69 Fed. Reg. 25,262 (proposed May 5, 2004); <u>see also</u> 70 Fed. Reg. 14,523 (eff. Mar. 23, 2005) (amending some provisions of the interim final rule). Thus, while the regulation has the effect of interpreting the definition of SDVO SBC in 15 U.S.C. § 632(q)(2), the regulation was adopted to implement 15 U.S.C. § 657f.

51% of the aggregate issued stock; however, "nondisadvantaged individuals" owned all of the Class B Common Stock and Preferred Stock. Id. at *2. The Class A Common Stock enjoyed full voting rights, but the Class B Common Stock and Preferred Stock enjoyed "limited voting rights"—specifically, voting rights required by applicable Wisconsin law plus the right to vote together to elect a minority number of directors to the Board of Directors. Id. at *3. The "disadvantaged individual," as holder of the Class A Common Stock, retained weighted majority voting control of the Board; as such, the Board could take no action unless approved by the "disadvantaged individual" who also could act on behalf of the board regardless of the objection or participation of any or all of the other directors. Id.

The SBA's initial decision nevertheless determined that the "limited voting rights" afforded the Class B Common Stock and Preferred Stock were sufficient to render such stock "voting stock" for purposes of the 8(a) BD program's ownership criteria. Id. at *2, *6. But the OHA found this conclusion irrational. Id. at *6. The OHA reasoned that the ownership criteria was in place to "ensure[] that financial benefits accrue to the disadvantaged individual, prohibit[] nondisadvantaged individuals' ownership of the kind of voting stock that could lead to control of the firm, and further ensure[] that the intended purposes of the legislation are accomplished." Id. Conversely, prohibiting "nondisadvantaged individuals" from owning stock with "'limited' voting rights that have no possible bearing upon the deprivation of the intended rights of the disadvantaged individual [was] clearly meaningless." Id. The "nondisadvantaged stockholders" had limited voting rights "in form" only; "in substance, . . . [they] ha[d] no ability to influence the management or operations [of the company] and [their] classes of stock should, therefore, not be considered voting stock." Id. "Furthermore, these voting rights afford[ed] no power to the ["nondisadvantaged" holders] to deprive the disadvantaged majority owner of the benefits that were intended to be his." Id. The SBA's initial decision "clearly elevate[d] form over substance." Id. Rather, the company "ha[d] carried its burden of proving that not only is 51 percent of the aggregate of all outstanding shares of stock unconditionally owned by [the disadvantaged individual], . . . but [he] likewise own[ed] 51 percent of each class of voting stock." Id. What was important, the OHA reasoned, was whether there was a materially adverse or "meaning[ful]" effect on the "intended rights" of the preferred status holder—on his or her voting and control, or rights, privileges, and benefits of ownership. See id.

B.    Analysis

The court must decide whether the OHA erred in its interpretation and application of 13 C.F.R. § 125.9(d), which requires that a SDV own, unconditionally and directly, "at least 51% of each class of voting stock" as a prerequisite to SDVO SBC status. The OHA broadly construed "class of voting stock" and concluded that Precise's Series A Common Stock and Series B Convertible Preferred Stock were separate classes because they were "sufficiently dissimilar" due to variations in dividend, conversion, and

redemption rights.  AR Tab 20 at 930–31 (OHA decision).  Because Mr. Curtis only owned "at least 51%" of Series A but none of Series B, the OHA ultimately determined that Precise failed to satisfy the SDV ownership criteria imposed by § 125.9(d) and was ineligible for SDVO SBC status.  Id.  Defendant and the intervenors agree with the OHA decision, asserting that it was a "reasonable interpretation and application of [13 C.F.R. § 125.9(d)] based upon relevant factors."  Def.'s Resp. & Cross Mot. J. AR (Def.'s MJAR), ECF No. 33, at 9; see also, generally, APL's Resp. & Cross-Mot. J. AR (APL's MJAR), ECF No. 32; B3's Opp'n & Cross-Mot. J. AR (B3's MJAR), ECF No. 34; B3's Mem., ECF No. 35.

Precise counters that the OHA's decision is "arbitrary, capricious, and lacks a rational basis" because "Precise's Articles establish[ed] a single class of voting stock, and the SDV own[ed] [more than 51%] of that stock."  Pl.'s Mot. J. AR (Pl.'s MJAR), ECF No. 30, at 3.  Precise maintains it had only one class of voting stock because:  (1) "[a]ll shareholders vote[d] as a single class on all issues;" (2) "[f]or every matter that require[d] shareholder approval, the SDV owner's vote [was] dispositive;" and (3) "distinctions between the SDV's shares and the ESOP shares . . . [did not] affect . . . the SDV's operation, management, or control;" or stated another way, "[m]inority shareholders [could not] under any circumstance overcome Mr. Curtis' position on any issue; nor [could they] vote to prohibit Mr. Curtis from accomplishing any lawful purpose."  Id. at 2–4.

Precise further contends that the OHA's decision was in derogation of its statutory mandate, id. at 5, and "cast its net much farther than its regulations allow," id. at 2, insofar as the OHA disregarded Precise's organizational documents reflecting a specific intent to create two "series" within a single "class," id. at 12–15, and instead distinguished "class[es] of voting stock" on characteristics that did not relate to voting rights, id. at 21, and that had no material adverse effect on Mr. Curtis' ownership and control, id. at 3–4, 28.  Precise advocates for a test that inquires:  "[I]f there are [voting stock] dissimilarities, whether they're meaningful in terms of the SDV's ownership interest and his ability to control and run the company on a daily basis."  Tr. 27:23–28:1. Such a test, Precise contends, would be "tethered to the congressional intent of the [SDVO SBC] program, that is, to make sure that the benefits of the program only go to service-disabled veterans' companies."  Id. at 48:7–9.

### 1.    Interpretation of the Regulation

When interpreting § 125.9(d), the AD/GC came to some conclusions, impliedly affirmed by the OHA, that were rational and adequately explained.  Precise's reference to "series" in its organizational documents, rather than "classes," was not dispositive.  See AR Tab 8 at 79 (AD/GC determination).  "[W]hat is important is not the nomenclature used, but how the firm's various sets of equity are treated."  Id.  The "SBA regulations are focused on treatment of the various classes, series, collections, sets, [and] groups of shares themselves, and how those various classes, series, collections, sets, [and] groups

function." Id. at 80 (punctuation altered).  Substance over form governs.  Id.  The "SBA will examine how the firm treats the various sets of equity and make an independent determination, regardless of naming conventions[.]"  Id.

On appeal, the OHA also interpreted § 125.9(d) with a measure of rationality and reason.  For example, the OHA found that a "class" may be distinguished by any number of characteristics.  See AR Tab 20 at 930–931 (OHA decision); see Def.'s MJAR 10 (arguing same).  The regulations do not define the term "class."  In the absence of a specific definition, the plain and ordinary meaning of the term applies.  See Tesoro Haw. Corp. v. United States, 405 F.3d 1339, 1346 (Fed. Cir. 2005) ("We construe a regulation in the same manner as we construe a statute, by ascertaining its plain meaning.") (citing, e.g., Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414–15 (1945)); Rumsfeld v. United Techs. Corp., 315 F.3d 1361, 1369–70 (Fed. Cir. 2003) (defining the term "cost" according to its "standard dictionary definition[]," citing Webster's Third New Int'l Dictionary 515 (1968)).  Here, the term "class" is defined broadly:  "A group of people, things, qualities, or activities that have common characteristics."  Black's Law Dictionary 304 (10th ed. 2014)).  Indeed, considering a wide array of possible dissimilarities among stock may inform not only whether there are separate "class[es] of voting stock," § 125.9(d), but also whether the SDV's ownership is "direct" and "unconditional," § 125.9(a), (d), and whether the SDV retains requisite "control," § 125.10.  The OHA also rationally reviewed the company's Articles and Bylaws in its attempt to uncover differences in the rights, privileges, and obligations among shareholders.[15]  See AR Tab 20 at 931.  Further, the OHA rationally considered dissimilarities in dividend preferences, redemption abilities, and conversion rights among shareholders because these differences were apparent on the face of Precise's organizational documents.  See id. at 930–31.

The OHA then turned to Maryland corporate law to define the characteristics dispositive of a "class," but did not provide a discernably thorough reasoned explanation for its analysis.  See id.  Maryland law plainly contemplates that a corporation may have "classes or series" of stock and these "classes or series" may be distinguished on

---

[15]      Although neither the AD/GC nor the OHA appear to have looked much beyond Precise's organizational documents, the court would not view negatively the SBA's examination of other evidence if it were relevant.  For example, the parties in this case offer varying evidence of Precise's intent.  See AR Tab 15 at 801, 816 (Precise website screenshots, stating "Precise Systems is an Employee Owned Service Disabled Veteran-Owned Small Business (SDVOSB)"); id. at 803, 818 (Precise website screenshots, describing itself as "an employee-owned company" and a "Disabled Veteran Owned Business"); see Tr. 20:8–21:10, 37:7-9, 40:1–5 (arguing Mr. Curtis' intent).  The court is not convinced that any of this particular evidence in this case is persuasive enough, though, to alter any conclusions one might draw from the company's organizational documents.

characteristics including preferred dividend, conversion, and redemption rights.  See, e.g., Md. Code Ann., Corps. & Ass'ns §§ 2-104(a)(7), 2-105(a)(1) (West 2013).  As Precise urged during oral argument, Maryland law does not prohibit an entity from establishing multiple "series" within a "class."  Tr. 47:6–14.  Defendant also correctly asserted that Maryland law does not definitively define or distinguish a "class" from a "series."  See Def.'s MJAR 17–18; Tr. 31:14–22; cf. Del. Code tit. 8, § 151(a) (2013) (providing a series may be a subset of a class—"Every corporation may issue 1 or more classes of stock or 1 or more series of stock within any class thereof").  Thus, Maryland law would not seem dispositive, yet the OHA summarily concluded Maryland law established Precise had separate classes of stock not two series within a single class.  While the OHA's reliance on Maryland law for the outcome here may be reasonable, the court cannot make such a determination on the conclusory reasoning before it.

The OHA seems to have focused on identifying classes of stock without ascribing any particular meaning or importance to the modifier "voting" in the phrase "voting stock," as it appears within § 125.9(d)'s requirement that the SDV own "at least 51% of each class of voting stock."  See AR Tab 20 at 930–31.  Again, because the regulations do not define the phrase, the court turns to its plain and ordinary meaning.  See Tesoro, 405 F.3d at 1346; Rumsfeld v. United Techs. Corp., 315 F.3d at 1369–70.  The phrase "voting stock" means:  "Stock for which the holder has the right to vote in the election of directors, in the appointment of auditors, or other matter brought up at the annual meeting."  Amer. Heritage Dictionary 1943 (5th ed. 2011); accord Black's Law Dictionary 1643–44 (defining "voting stock" as "[s]tock that entitles the holder to vote in the corporation's election of directors and on other matters that are put to a vote"); cf. id. at 1643 (defining "nonvoting stock" as "[s]tock that has no voting rights under most situations").  Likewise, when "voting" is viewed as an attribute of "stock"—as an adjective modifying a noun—it means stock "entitling one to vote."  See Webster's Third New Int'l Dictionary 2565 (1993) (defining "voting").  So broadly defined, the Series B stock at issue here plainly appears to be "voting stock."

While it is helpful to start from the knowledge that the individual terms "class" and "voting stock" are defined broadly, ultimately § 125.9(d) uses the terms together in the phrase "class of voting stock."  This wording suggests it is "voting stock" that qualifies what potential groups of stock ("class[es]") are relevant, and vice versa.  See Def.'s MJAR 11–12 (arguing same).  For example, if the SBA identified a privilege enjoyed by a group of shareholders, but this group had no voting rights on any issue, the group and its privilege could conceivably be disregarded for purposes of § 125.9(d)'s ownership analysis.  See Def.'s MJAR 9 (citing, for helpful comparison, Size Appeal of: Native Energy & Tech., Inc., SBA No. SIZ-5249, 2011 WL 4429042, at *10 (Jun. 16, 2011), which disregarded non-voting stock "as an indicia of control under the totality of the circumstances" in size appeal).

The inquiry into what constitutes "class[es] of voting stock" is not just an intellectual exercise, but is part of the criteria for determining whether a service-disabled veteran sufficiently owns a small business concern.  See § 125.9(d).  Thus, having identified variances among Precise's voting stock, the OHA considered what weight to give the identified dissimilarities, applying a "sufficiently dissimilar" test.  See AR Tab 20 at 931.

However, the OHA failed to give meaning to its "sufficiently dissimilar" test because it offered no guideposts for measuring "sufficiency."  The government admits this frailty in the OHA's decision.  See Tr. 41:15–16 ("[I]t's true, OHA did not specifically lay out factors that would go to sufficiently dissimilar.")  The government argues, though, that despite the lack of explicit guideposts one can infer that the OHA "was looking at important differences in rights and privileges between the different categories of shareholders."  Id. at 41:16–41:19 (emphasis added).  But saying that the OHA looked for what was "important" affords no more clarity about what was "sufficient."  So, too, the government's further comment that the OHA would look to "numerosity and materiality of the distinctions," Tr. 42:16–24, might provide more guidance but still begs the question, "what is material?"

There are obvious sources from which guideposts are commonly drawn but the OHA makes no attempt to tie what is "sufficiently dissimilar" to any of them,[16] such as (i) the purpose or intent of the statutory or regulatory ownership requirements; (ii) the SBA's mandate; or (iii) the congressional intent behind set-asides for SDVO SBCs in government contracting generally.  Cf. Precision, SBA No. 384, 1991 WL 540468, at *5–7 (considering whether limited voting rights held by "class of voting stock" had a material adverse effect on the ownership or other rights and privileges that Congress and the SBA had intended for the beneficiary in the protested concern).  Likewise, the OHA could have found guideposts in the words and phrases surrounding "each class of voting stock,"—e.g., does a difference among the stock affect the SDV's "ownership" generally or, more specifically, the SDV's ability to hold his or her ownership interest "directly and unconditionally"?  See § 125.9(d).  Or, as argued by Precise, the OHA could have followed precedent in the analogous 8(a) BD Program and/or independently concluded that only those dissimilarities that related to voting rights would be material.  See Pl.'s MJAR 15–18, 21–28; Pl.'s Reply, ECF No. 37, at 2–3, 9–13; cf. 69 Fed. Reg. at 25,263 (noting that the "SBA and its [OHA] ha[ve] established policy on [control] criteria [under the 8(a) BD program] that [would] be helpful for [the SDVO SBC] program.").

The OHA goes even further to reject the reasoning set forth in Precision, which employs these guideposts when applying its material differences approach in the context of the SBA's 8(a) BD program.  See id. at 931.  The OHA summarily rejected Precision

---

[16]    The OHA also failed to address the AD/GC's "functional equivalen[cy]" approach or how it related to the OHA's "sufficiency dissimilar" approach.

because that decision was purportedly "based on the flawed premise that voting rights are the only possible distinguishing characteristic of a class of stock." Id. So, too, defendant argues that this court should summarily reject Precision as having "no applicability to the current case" because it involved the SBA's 8(a) BD program, not its SDVO SBC program, and was focused on whether the admitted "classes" of stock in that case were "voting stock." Def.'s MJAR 19–20. But these arguments obscure the fact that Precision stands for a much broader principle—namely, that differences in stock that either do not adversely affect control or benefits, or are subordinate to greater control or benefits, in the individual upon whom status is based, are "meaningless" and therefore can be disregarded when assessing ownership. See discussion supra Part IV(A); cf. Nat'l Welders Supply Co., Inc., SBA Nos. 4315 & SIZ-2-6-7, 1998 WL 423884, at *5–6 (June 21, 1998) (considering totality of the circumstances, and specifically the practical effect of the relationship between two entities, when weighing whether their affiliation rendered the subject entity "other than small" in a size appeal).[17]

Moreover, there is some evidence that the SBA intended consistency between its 8(a) BD program and its SDVO SBC program. The programs employ materially identical ownership criteria. Compare 13 C.F.R. § 125.9(d), with 13 C.F.R. § 124.105(d). The SBA also amended the SDVO SBC program's "direct" ownership requirements, which appear at § 125.9(a), so that they would be "consistent with [the] SBA's other programs, including the 8(a) Business Development Program." 69 Fed. Reg. at 25,263. Yet, in rejecting Precision, the OHA neither addressed the basis for disregarding a materiality standard tied to the purpose of the regulation, nor the OHA rationale for deviating from its own precedent in an analogous context. For example, although there may be different policy rationales underlying the programs, see APL's MJAR 6–7, the OHA failed to articulate any such reasoning in its decision. And, while the OHA is not required to give Precision deference in Precise's protest, see Freeman v. United States Dep't of Interior, 37 F. Supp. 3d 313, 329 (D.D.C. 2014), the OHA is required to give a coherent and reasoned explanation of its decision that considers all important aspects of the problem, see Nat'l Ass'n of Home Builders, 551 U.S. at 658; Motor Vehicle Mfrs.,

---

[17]     Complaining that "the issue of control" is "bleeding into this case," defendant asserts "that ownership and control are two separate and distinct matters, and we know that because SBA has a [different] regulation, that's 13 C.F.R. § 125.10, . . . which specifically deals with the issue of control." Tr. 34:20–22; 35:11–15; see, generally, id. at 34:20–36:13. Although defendant's argument might have some merit, the OHA did not address it in its decision. Nor is the argument well developed in this record—which altogether fails to address the separate but inextricable link between ownership and control.

463 U.S. at 43–44; Impresa Construzioni, 238 F.3d at 1333; In re Sang Su Lee, 277 F.3d at 1342.[18]

At best, the OHA's "sufficiently dissimilar" guidepost might have been Maryland law, insofar as the OHA found dispositive those variances among Series A and Series B that were listed among possible distinguishing characteristics of stock under Maryland law. See AR Tab 20 at 930–31. But, without more from the OHA, the court cannot evaluate the rationality of the agency's decision regarding eligibility.

Nor is the court persuaded by the government's argument that the "sufficiently dissimilar" test, without guideposts, should be upheld because: (i) it is a bright-line test; and (ii) the agency has an interest in avoiding time-consuming factual analysis. First, the court does not question the merits of a "clear rule, offering clarity, offering predictability," Tr. 40:10–11, 39:5, one that would allow "people in the SDV community, . . . [to] know what [the criteria] means, [so that] that they can structure their corporations accordingly," id. at 39:3–4. Nor does the court question that such a "clear rule" might "reduce the uncertainty of [an alternative] multi-factor, very fact-intensive analysis." Id. at 39:6–7. But for the reasons already set forth, the "sufficiently dissimilar" test employed by the OHA in this case, without guideposts, is not at all a clear rule.

Second, the government's argument for avoiding time-consuming factual analysis may have some basis. "Certainly agencies have a responsibility to reach decisions on protests promptly." Miles Constr., LLC v. United States, 108 Fed. Cl. 792, 804 (2013). But here the concern is largely a non-sequitur. The agency advocates a test hinging on "sufficiency" that cannot be applied without factual analysis and, indeed, the OHA engaged in factual analysis of Precise's organizational structure to reach its ineligibility decision. What the OHA failed to do was to provide an adequately reasoned explanation for its conclusions in writing. Such an explanation is required under 5 U.S.C. § 706(2)(A), as firmly held by the Supreme Court in Motor Vehicle Mfrs. and Nat'l Ass'n of Home Builders, and their progeny. See discussion supra Part III (bid protest standard of review). This court is not in a position to, nor would it, upset that obligation for the agency's convenience.

---

[18] In addition, as Precise points out, "[a]s a result of [the] OHA's ruling, the SBA rules governing ownership of an SDVO[]SBC are now irreconcilable with the VA's rules." Pl.'s MJAR 19–20. Despite the obvious logic from a policy perspective in reconciling either the regulations themselves—the SBA's 13 C.F.R. § 125.9(d) and the VA's 38 C.F.R. § 74.3(a)—or at least their interpretations, the court has no authority to compel such reconciliation. See Def.'s MJAR 21–22 (noting that policy arguments are "more appropriately addressed to SBA or VA policy officials responsible for drafting the regulations").

2.      Application of the "Sufficiently Dissimilar" Standard to Precise

The OHA identified three variances between Series A Common Stock and Series B Convertible Preferred Stock:  (i) Series B shareholders enjoyed the Preferred Dividend; (ii) Series B shareholders had a right to convert their shares, one for one, to Series A Common Stock; and (iii) the company (essentially Mr. Curtis as the majority shareholder) was empowered to vote to redeem (or buy back) the Series B shares from the ESOP, but there was no corollary preferred dividend, conversion, or redemption rights for the Series A shareholders.  AR Tab 20 at 931; see also Tr. 15:15–16:1, 19:17– 20:7 (discussing same).  The OHA then determined these variances were "sufficient" to render Series A and Series B separate "classes" for purposes of 13 C.F.R. § 125.9.  AR Tab 20 at 931.

But the OHA offered little explanation as to why the variances were "sufficient" to conclude that Mr. Curtis (the SDV) lacked sufficient ownership rights.  It appears the OHA based its sufficiency conclusion on the mere fact that the variances existed and reflected rights enjoyed or obligations suffered by Series B shareholders that were not shared equally by the SDV in his capacity as the Series A shareholder.  See id.  The mere existence of differences, though, says nothing of the relevance or materiality of any of the differences.  See Pl.'s Reply 2.

In short, the government has neither "'provided a coherent and reasonable explanation of its exercise of discretion'" in decertifying Precise, Impresa Construzioni, 238 F.3d at 1333 (quoting Latecoere Int'l, 19 F.3d at 1356), nor articulated a "'a rational connection between the facts found and the choice made,'" Motor Vehicle Mfrs., 463 U.S. at 43 (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)).

V.      Conclusion

For the reasons stated, the court cannot find, based on the record before it, that Precise either was or was not an eligible SDVO SBC at the time of its offer.  Thus, the SBA's OHA decision is **SET ASIDE** and the court **REMANDS** this matter to the SBA to determine, consistent with this opinion, whether Precise satisfies ownership criteria for SDVO SBC status.  See Beta Analytics Int'l, Inc. v. United States, 67 Fed. Cl. 384, 395 (2005) (noting that matters of technical expertise are best left to "the special expertise of procurement officials" (citing E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996))).  The court **STAYS** the parties' motions for judgment on the administrative record, ECF Nos. 30, 32–34, for the duration of remand.

On remand, it is the SBA's prerogative to determine whether or not it will maintain its position regarding Precise's eligibility.  In either circumstance, the SBA shall set forth its rationale for the decision with greater clarity regarding the standard for assessing eligibility and how it applies to Precise.  See Mark Dunning I, 58 Fed. Cl. at 225 (citing SEC v. Chenery Corp., 332 U.S. 194, 196–97 (1947)).  The court observes

that while the "SBA is the best interpreter of its own regulations," id. (citing Lyng v. Payne, 476 U.S. 926, 939 (1986); Udall v. Tallman, 380 U.S. 1, 16 (1965)), it must offer a reasonable interpretation of them.  Id. (citing Northern Ind. Pub. Serv. Co. v. Porter Cty. Chapter of Izaak Walton League, 423 U.S. 12, 16 (1975)).

The SBA shall file its determination with the court by **May 4, 2015**.  See RCFC 52.2(b)(1)(B), (e).  In addition, in order not to further delay these proceedings, the parties shall contact the court, within **three (3) days** of the SBA's decision, to schedule a status conference.

IT IS SO ORDERED.

　s/ Patricia Campbell-Smith　　　　　
PATRICIA CAMPBELL-SMITH
Chief Judge