# In the United States Court of Federal Claims

## BID PROTEST

No. 14-1174C
(E-Filed Under Seal: July 22, 2015)
(Re-issued for Publication: July 28, 2015)[1]

|  |  |  |
|---|---|---|
| PRECISE SYSTEMS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Bid Protest; Small Business |
| | ) | Administration (SBA); Office of |
| THE UNITED STATES, | ) | Hearings & Appeals (OHA); Service- |
| | ) | Disabled Veteran Owned Small |
| Defendant, | ) | Business Concern (SDVO SBC); |
| | ) | Eligibility; Status; Ownership Criteria; |
| and | ) | 15 U.S.C. § 632(q); 13 C.F.R. pt. 125; |
| | ) | 13 C.F.R. §§ 125.9(d), 125.10; |
| ALL POINTS LOGISTICS, LLC, and | ) | Decision After Remand to Agency |
| B3 SOLUTIONS, LLC, | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |
| | ) | |

Kevin P. Mullen, Washington, DC, for plaintiff. Damien C. Specht and Charles L. Capito, Washington, DC, of counsel.

Martin M. Tomlinson, Trial Attorney, with whom were Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Robert E. Kirschman, Jr., Director, and Steven J. Gillingham, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant.

---

[1]     The court originally issued this decision under seal. Plaintiff then requested redaction of the percentages of stock held by the company's owners. ECF No. 69. Plaintiff also requested the court adopt one additional fact. Id. Defendant consented to these requests and the intervenors did not object. Id. The court accepts the proposed redactions because good cause exists to protect the capitalization of plaintiff, a privately held company. Redactions are indicated in this opinion by bracketed phrases "[more than 51%]" and "[less than 51%]." The court also adopts the additional fact proposed by plaintiff, which appears as notes 2 and 8, infra, because it appropriately clarifies the record.

Thomas K. David, Reston, VA, for defendant-intervenor All Points Logistics, LLC.
Kenneth D. Brody, Reston, VA, of counsel.

Kathryn V. Flood, Washington, DC, for defendant-intervenor B3 Solutions, LLC.
Pamela J. Mazza and Patrick T. Rothwell, Washington, DC, of counsel.

OPINION AND ORDER

CAMPBELL-SMITH, Chief Judge

In this bid protest, Precise Systems, Inc. challenges rulings of the Small Business Administration (SBA), affirmed by the Office of Hearings and Appeals (OHA), that found Precise was not an eligible "service-disabled veteran-owned small business concern" (SDVO SBC) for failure to satisfy ownership criteria set forth in SBA regulations. Central to Precise's challenge is whether the agency erred in its interpretation and application of 13 C.F.R. § 125.9(d) (2013), which requires that a service-disabled veteran own, unconditionally and directly, "at least 51% of each class of voting stock" as a prerequisite to SDVO SBC status. The agency had broadly construed "class of voting stock," and had concluded that Precise's Series A Common Stock and Series B Convertible Preferred Stock were separate "class[es]." Because the service-disabled veteran-owner of Precise held "at least 51%" of Series A but none of Series B, the agency had ultimately determined that Precise failed to satisfy ownership criteria for SDVO SBC status.

In an earlier decision, the court took issue with some inadequacies in the agency's reasoning and therefore set aside the OHA's original decision and remanded, directing the OHA to revisit its findings and expand on its rationale consistent with the court's opinion. See Precise Sys., Inc. v. United States, 120 Fed. Cl. 586 (2015). On remand, the OHA re-affirmed the ineligibility determination with expanded reasoning. The parties then returned to this court on appeal, revived their pre-remand dispositive motions, and submitted post-remand supplemental briefing. The court now enters its final decision upholding the agency's determination that the service-disabled veteran, on whom Precise's status is based, did not have sufficient ownership to maintain the company's status as an SDVO SBC.

I.    Background

    A.    Facts

A full statement of the facts is set out in the court's April 2015 decision. Precise, 120 Fed. Cl. at 588–91. In brief, Precise Systems, Inc. is a Maryland small business in the aviation management and engineering services industry. Compl. ¶¶ 9, 14, Dec. 5, 2014, ECF No. 1; see Administrative Record (AR) Tab 15 at 830 (Art. of Amend. &

Restatement (Am. Art.), Nov. 30, 2012.  In January 2014, Precise responded to a Department of State solicitation entirely set aside for SDVO SBCs.  Compl. ¶¶ 26–28; see AR Tab 15 at 797 (solicitation excerpt at § B-1).  Precise's response would have included a self-certification of SDVO SBC status as required by 13 C.F.R. § 125.15(a)(1) (2013).  At the time, Mr. John Thomas Curtis, a service-disabled veteran, held [more than 51%] of Precise's issued shares and Precise's employees held the remaining [less than 51%] of issued shares through an Employee Stock Ownership Plan.  See AR Tab 11 at 740–41; Compl. ¶¶ 15, 17–18, 22.  All of Mr. Curtis's shares were Series A Common Stock, and all of the employees' shares were Series B Convertible Preferred Stock. Compl. ¶¶ 21–22; see AR Tab 15 at 830 (Am. Art., art. III(a)).  Series A and Series B shareholders were entitled to an equal one vote per share, regardless of series.  AR Tab 15 at 830 (Am. Art., art. III(a)); see AR Tab 11 at 616–19 (Am. & Restated Bylaws (Am. Bylaws), Nov. 30, 2012, at art. III §§ 6, 8).  However, there were distinctions between the series.  See Precise, 120 Fed. Cl. at 589–90 (full discussion).  Notably, (i) Series B shareholders were entitled to cumulative preferential dividends before the Series A shareholder; (ii) Series B shareholders were entitled to convert their shares to Series A, but the Series A shareholder did not enjoy a reciprocal conversion right to Series B; and (iii) only Series B shares (not Series A shares) were subject to redemption by the company.  AR Tab 15 at 831–35 (Am. Art., art. III(c)).

The Department of State selected Precise as the apparent awardee from among fifteen SDVO SBC offerors.  See Compl. ¶ 10; AR Tab 15 at 872 (SBA Notice).  Four unsuccessful offerors—including defendant-intervenors All Points Logistics, LLC (All Points) and B3 Solutions, LLC (B3)—filed agency protests challenging Precise's SDVO SBC status.  See AR Tab 14 at 773–74, Tab 15 at 791–93, 826–28, 845–48, 883–88 (four protests).  The protests claimed, in relevant part, that Precise was ineligible for SDVO SBC status because it was not owned, unconditionally and directly, by a service-disabled veteran due to its ESOP.  The Department of State agreed to stay award or performance of the subject contract pending resolution of this protest.  Compl. ¶ 55.

B.     Proceedings before the SBA's AD/GC

On September 10, 2014, the SBA Acting Director of Government Contracting (AD/GC) sustained the protests.  See AR Tab 8 at 77–84 (AD/GC determination).  The AD/GC found that Precise did not satisfy regulatory criteria for service-disabled veteran ownership at the time of its offer and was therefore not a SDVO SBC entitled to bid on or receive the subject procurement.  Id.

The applicable SBA regulation requires:

A concern must be at least 51% unconditionally and directly owned by one or more service-disabled veterans.  More specifically:

. . . .

3

> In the case of a concern which is a corporation, <u>at least 51% of the aggregate of all stock outstanding</u> and <u>at least 51% of each class of voting stock outstanding</u> must be unconditionally owned by one or more service-disabled veterans.

13 C.F.R. § 125.9(d) (2013) (emphasis added).

There was no dispute that Precise satisfied the first prong through Mr. Curtis's majority ownership of all outstanding stock.  AR Tab 8 at 79.  However, Precise did not satisfy the second prong, the AD/GC reasoned, because Precise's Series A and Series B qualified as separate "class[es] of voting stock" and Mr. Curtis held "at least 51%" of only Series A but none of Series B.  Id. at 79–80.  The fact that Precise labeled the two groups of stock as "series" was not dispositive because "what is important is not the nomenclature used, but how the firm's various sets of equity are treated."  Id. at 79.  Substance and function governs over naming conventions.  Id. at 80.  Nor was it dispositive that all outstanding stock was entitled to one vote per share, regardless of series.  Id.  The AD/GC found that Precise's Series A and Series B were "not functionally equivalent" in light of their "separate voting rights on at least one issue," declaring and paying dividends.  Id. ("[Precise] may declare and pay a dividend on any class or series of stock without declaring and paying a dividend on any other class or series of stock if stockholders of a majority of the shares of each of the classes or series of stock not receiving a dividend consent . . . ." (quoting AR Tab 15 at 831 (Am. Art., art. III(b)(ii)))).  Series B also enjoyed a preferred dividend right.  Id. at 80; AR Tab 15 at 831 (Am. Art., art. III(c)(1)).  Based on these distinctions, the AD/GC concluded that the two groups of shares were separate classes, triggering the regulatory requirement that Mr. Curtis own "at least 51%" of each one.  AR Tab 8 at 80.  Because he did not, Precise was not an eligible SDVO SBC for the subject procurement, or for any future procurements set aside for SDVO SBCs.[2]  Id. at 80, 81.

C.      Appeal to the SBA's OHA

Precise appealed the AD/GC's determination to the SBA's OHA.  In November 2014, the OHA found no "clear error of fact or law," see 13 C.F.R. § 134.508 (standard

---

[2]      Following this determination, Precise submitted new documentation to the SBA reflecting changes to the company's capital structure, and requested that the SBA examine its status in light of those changes.  On January 27, 2015, the SBA determined that Precise "satisfactorily addressed the grounds on which the SBA previously found [Precise] ineligible for SDVO SBC status," and concluded that Precise "is now eligible to submit offers and receive awards for SDVO SBC contracts."  SBA Letter, Jan. 27, 2015, ECF No. 69-2.  Thus, Precise is eligible to compete on future procurements, and the court herein considers only whether Precise is or was eligible to compete on the Department of State procurement at issue in this litigation.

of review), in the AD/GC's determination that Precise had not meet eligibility criteria in 13 C.F.R. § 125.9(d), Precise Sys., Inc., SBA No. VET-243, at *10–11 (Nov. 6, 2014) (OHA decision)).  The OHA reasoned, "SBA regulations are silent as to what constitutes a 'class' of stock" as well as how to "distinguish a 'class' from a 'series.'" Id. at *9. However, Maryland law—under which Precise incorporated—suggests that a broad range of criteria can distinguish classes of stock.  Id.  In support, the OHA cited Maryland's corporate code, which provides:  "'If the stock is divided into classes,' the corporation's articles of incorporation must include 'a description of each class including any preferences, conversion and other rights, voting powers, restrictions, limitations as to dividends, qualifications, and terms and conditions of redemption.'"  Id. (quoting Md. Code Ann., Corps. & Ass'ns § 2-104(a)(7) (West 2013)).  Thus, the OHA concluded, the AD/GC had not erred in electing to distinguish "class[es] of voting stock" based on more than just dissimilarities in voting rights, which Precise had argued should have been the sole factor.  Id. at *9–10.  Precise had merely "[sought] to substitute its own [narrower] interpretation of the regulation for [the AD/GC's broader interpretation]." Id. at *9.

The OHA further resolved that there was no clear error in the AD/GC determination to treat Precise's Series A and Series B as separate "class[es] of voting stock" for purposes of 13 C.F.R. § 125.9(d). Id. at *10.  The OHA reasoned that the series were "sufficiently dissimilar" not only due to their different dividend rights (as the AD/GC had noted), but also because Series A and Series B had different conversion and redemption rights.  Id. (citing Am. Art., art. III(c)(1)(C), (c)(2), and (c)(3)).

In addition, the OHA rejected concerns that affirming the AD/GC's determination would depart from OHA precedent in Precision Analytical Lab., Inc., SBA No. 384 (Nov. 4, 1991), which interpreted similarly worded ownership criteria for the SBA's 8(a) Business Development (BD) program, see 13 C.F.R. § 124.103 (1989), now at 13 C.F.R. § 124.105(d) (2015).  OHA decision, at *5, *10.  The OHA described Precision Analytical as "based on the flawed premise that voting rights are the only possible distinguishing characteristic of a class of stock." Id. at *10.  The OHA also rejected concerns that its decision would be inconsistent with the Veteran Administration's SDVO SBC program, noting that the VA program "is a separate program from that of [the] SBA, and it specifically exempts ESOPs." Id. (citing the VA's ESOP exception, 38 C.F.R. § 74.3(a)).  The "SBA's program contains no such exemption, and there is no legal basis for OHA to read in such an exception."  Id.  Lastly, the OHA disregarded Precise's argument that the AD/GC determination was "poor policy, as it [would] discourage other, would-be SDVO SBCs from creating ESOPs;" such criticisms, the OHA noted, were outside its purview and should be directed to policy officials.  Id.  In the end, the OHA concluded the AD/GC had not erred in finding Precise had failed to meet the ownership eligibility criteria for SDVO SBC status.  Id.

D.    This Court's Decision Directing Remand

Precise then appealed to this court, arguing that the OHA decision was "arbitrary, capricious, lacked a rational basis, and [was] contrary to law."  Compl. ¶ 1; see 28 U.S.C. § 1491(b)(4) (2012) (incorporating 5 U.S.C. § 706(2)(A) as the court's review standard in bid protest cases).  On review, this court held the OHA had appropriately looked beyond Precise's mere labeling of its stock as "series" to assess actual differences between the stock.  Precise, 120 Fed. Cl. at 599.  The OHA had exercised its authority properly to conclude that a broad range of characteristics, not just dissimilarities in voting rights, may distinguish a "class of voting stock."  Id.  Furthermore, the OHA had not erred in then turning to examine the company's organizational documents for potential differences between the series in rights, powers, privileges, and limitations.  Id. at 599–600.  Nor had the OHA erred in considering whether the differences identified—here, dissimilarities in dividend rights, conversion rights, and redemption abilities—were of a type that would render the company's two groups of shares separate "class[es] of voting stock" under the regulation.  See id. at 600.  To that end, the OHA had also looked, rationally, to applicable Maryland state law for guidance.  Id.

The OHA's decision had fallen short, however, in summarily concluding that the dissimilarities in this case were "sufficient."  Id. at 601–03.  Maryland law is opaque on what necessarily constitutes a "class" or distinguishes a "class" from a "series," id. at 600, and the OHA had failed to offer any other guideposts for measuring sufficiency, id. at 601, or to explain how its "sufficiently dissimilar" standard might be the same as, or vary from, the AD/GC's "functional equivalency" standard, id. at 601 n.16.

The OHA also had summarily rejected as precedent its own decision in Precision Analytical, at *6, as having "no applicability to the current case."  Id. at 601.  The OHA reasoned that Precision Analytical considered only whether a "class" of stock had sufficient voting rights to qualify as "voting stock;" in contrast, here the parties admit Series A and Series B were "voting stock" but dispute whether they were separate "classes."  But the two programs plainly parallel one another and this court expressed concern that Precision Analytical could be read to stand for the broader principle that the SBA may disregard differences in stock that either do not adversely affect control or benefits, or are subordinate to greater control or benefits, in the individual upon whom status is based.  Id. at 601–02 (citing Nat'l Welders Supply Co., Inc., SBA Nos. 4315 & SIZ-2-6-7, at *5–6 (June 21, 1998) (considering the totality of the circumstances, and specifically the practical effect of the relationship between two entities, when weighing whether their affiliation rendered the subject entity "other than small" in a size appeal)).  Thus, the OHA should have provided a more thorough explanation for disregarding its Precision Analytical decision.  Id. at 602.

Moreover, it appeared to this court that ultimately "the OHA based its sufficiency conclusion on the mere fact that the variances existed" but the court was concerned that "[t]he mere existence of differences . . . says nothing of the relevance or materiality of

any of the differences." Id. at 603.  Accordingly, the court set aside the OHA's decision and remanded to the OHA to re-assess Precise's status and "set forth its rationale for the decision with greater clarity regarding the standard for assessing eligibility and how it applies to Precise." Id.

E.      The OHA's Redetermination on Remand

On remand, the OHA expanded on its rationale in re-affirming the AD/GC's finding that Precise was ineligible for SDVO SBC status because it did not meet the ownership requirements under 13 C.F.R. § 125.9(d).  Precise Sys., Inc., SBA No. VET-246 (Apr. 30, 2015) (OHA Redetermination).

The OHA opened its analysis noting that the plain meanings of key terms supported the AD/GC's finding that Precise's Series A Common Stock and Series B Convertible Preferred Stock were separate "class[es] of voting stock." Id. at *9–10.  The OHA referenced Black's Law Dictionary having broadly defined a "class of stock" as "[a] category of corporate shares used when more than one type of stock is issued" and has having listed "preferred stock" and "common stock" as two examples. Id. at *9 (quoting Black's Law Dictionary 285 (9th ed. 2009)).  In turn, "common stock" and "preferred stock" are each individually defined under "stock" as distinct "class[es] of stock" whose salient distinguishing trait is a difference in dividend rights:

> **Common stock.**  A class of stock entitling the holder to vote on corporate matters, to receive dividends after other claims and dividends have been paid (esp. to preferred shareholders), and to share in assets upon liquidation. Common stock is often called *capital stock* if it is the corporation's only class of stock outstanding. — Also termed *ordinary shares*.  Cf. *preferred stock.*
>
> * * *
>
> **Preferred stock.**  A class of stock giving its holder a preferential claim to dividends and to corporate assets upon liquidation but also that usu. carries no voting rights. — Also termed *preference shares*.  Cf. *common stock.*

Id. (quoting Black's Law Dictionary 1552–53); accord Am. Heritage Dictionary 373, 1383 (4th ed. 2000) (defining "common stock" as "[c]apital stock that is secondary to preferred stock in the distribution of dividends and often of assets" and "preferred stock" as "[c]apital stock having priority over a corporation's common stock in the distribution of dividends and often of assets").

Conversely, the OHA noted, "voting stock" is not defined as a "class of stock" but rather as merely a type of "[s]tock that entitles the holder to vote in the corporation's election of directors and on other matters that are put to a vote." OHA Redetermination, at *10 (quoting Black's Law Dictionary 1553).  Thus, the OHA reasoned, "the fact that

7

two groups of stock have identical voting rights does not establish that they are the same class of stock." Id. Moreover, the definitions support a conclusion that "the boundaries of a 'class of stock' [shall be] determined by the characteristics of the underlying shares, not by whether groups of shares vote together." Id. at *11. Lastly, as neither "series" nor "series of stock" is defined, the SBA is not bound to ascribe a particular definition or weight to those terms. See id. at *10.

"Applying these definitions to the instant case," the OHA concluded, "it is clear that [Precise's] 'Series A Common Stock' and 'Series B Convertible Preferred Stock' are both 'voting stock,' as they enjoy equal voting rights." Id. In addition, "each must be considered a 'class of voting stock' under 13 C.F.R. § 125.9(d)" and are distinct from one another based on their differences in dividend rights, if not also conversion and redemption rights. Id. at *10–11.

The OHA went on to reason that, even if the definitions themselves were not dispositive, the AD/GC rationally determined that the two series were not "functionally equivalent" given the undisputed differences in dividend rights, conversion rights, and redemption rights. Id. at *11–14. The OHA found the AD/GC's "functionally equivalent" inquiry was a rational means of "ascertain[ing] the true nature and character of the two groups of outstanding stock . . . based on function, and not form." Id. at *11. Moreover, the OHA noted, the SBA has employed a "functional equivalency" test in other contexts. Id. at *11 n.1 (citing Size Appeal of North Slope Tech. Ltd., SBA No. SIZ-2217, at *5 (July 12, 1985)). In North Slope, for example, the OHA concluded that "where . . . a firm undergoes a mere change in corporate form, or the functional equivalent thereof, and constitutes but a successor to an alleged affiliate, . . . such firms may be considered a single concern for purposes of applying [SBA's regulations]." Id. (quoting North Slope, at *14). The OHA explained that this analysis "derives . . . from an attempt accurately to assess the true character and nature of the specific corporation evaluated regardless of the formalities of its organization." Id. (quoting same). To hold otherwise would allow Precise to avoid ownership requirements merely by naming the groups of its stock "series" rather than "classes." See id. at *11.

The OHA further noted that its decision—to recognize separate "class[es] of voting stock" in Series A and Series B—was not inconsistent with Maryland law, which does not definitively distinguish between a "class" and "series." See id. at *12. Nor was the decision inconsistent with Precision Analytical, which was distinguishable, the OHA re-asserted, because the decision "merely found that one of the classes in question was not voting stock" based on the lack of any "significant voting rights." Id. at *14. Furthermore, any potential inconsistencies with the VA's SDVO SBC program were justifiable given that the VA partially exempted ESOPs from its ownership analysis. Id. (citing the VA's ESOP exemption, 38 C.F.R. § 74.3(a), and the VA's rationale for the exemption, 75 Fed. Reg. 6,098, 6,100 (Feb. 8, 2010)).

Lastly, the OHA rejected Precise's argument that only those distinctions between

groups of stock that materially detract from the service-disabled veteran's ownership and control of the company should be dispositive. Id. at *12.  The OHA stressed the importance of maintaining separation between the ownership analysis, governed by 13 C.F.R. § 125.9(d), and the control analysis, governed by 13 C.F.R. § 125.10.  Id.  Had the SBA intended the inquiries to merge, the SBA would not have promulgated distinct regulations with distinct criteria.  See id.  "Likewise, OHA has repeatedly held that ownership and control are distinct requirements, and if a firm fails either, it is not an eligible SDVO SBC."  Id. at *12–13 (citing Heritage of Am., LLC, SBA No. VET-142, at *5 (Nov. 12, 2008) (specifying that a firm is not an eligible SDVO SBC if it fails to meet either the ownership requirements or the control requirements); IITS-Nabholz, LLC, SBA No. VET-114, at *7–8 (Feb. 28, 2007) (weighing ownership and control separately)).  Moreover, the wisdom of maintaining separate inquiries was a matter of policy outside the OHA's purview.  Id. at *13.  Thus, the OHA resolved that the service-disabled veteran's undisputed control over Precise did not diminish the requirement that the service-disabled veteran also sufficiently own Precise.  See id. at *12–13.

II.    Analysis

For the reasons set forth in Precise, 120 Fed. Cl. at 594–96, the court may exercise jurisdiction over this dispute pursuant to 28 U.S.C. § 1491(b)(1) (2012), and will determine whether the SBA's rulings are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" pursuant to 5 U.S.C. § 706(2)(A) (2012) and 28 U.S.C. § 1491(b)(4).  Prior to remand, the parties had fully briefed cross-motions for judgment on the administrative record, see Precise, 120 Fed. Cl. at 594 n.10 (detailing pre-remand submissions at ECF Nos. 30, 32–35, 37–40), and had participated in oral argument, see Tr., Mar. 4, 2015, ECF No. 44.  Following remand, the parties submitted supplemental briefs (Supp. Br.), see ECF Nos. 59–62, and supplemental responses (Supp. Resp.), see ECF Nos. 63–66.  The central issue on remand remains whether the SBA erred in finding that Precise was not an eligible SDVO SBC because its Series A and Series B stock were separate "class[es] of voting stock" and the service-disabled veteran did not own "at least 51% of each class," in violation of 13 C.F.R. § 125.9(d).

In pre- and post-remand briefing, Precise argues that Series A and Series B were merely two series within "a single class of voting stock" because, regardless of series, each share carried one vote and the shareholders voted together on substantially all issues.  Pl.'s Supp. Br. 2, ECF No. 61; Pl.'s Supp. Resp. 1, ECF No. 65.  Precise further contends that the OHA should have disregarded the differences between the series because the differences did not detract from, and in many ways enhanced, the service-disabled veteran's ownership and control of the company.  Pl.'s Supp. Br. 2.

The government and the intervenors respond in support of the OHA rulings.  Mindful of the standard of review, they argue that the rulings are not inconsistent with the SBA statute, SBA regulations, and applicable state law.  Def.'s Supp. Br. 6–8, 10–13, ECF No. 62.  They further argue that the facts of this case render Precision Analytical

distinguishable.  Def.'s Supp. Br. 11–12; All Points Supp. Br. 6–10, ECF No. 60; B3 Supp. Br. 9–11, ECF No. 59.  The government and the intervenors contend that the OHA rationally concluded that the differences between the series were indicative of distinct "class[es] of voting stock"—a conclusion, the OHA adequately reasoned, that was supported by the plain meaning of key terms, the fact that the two series were not "functionally equivalent," and the purpose and congressional intent behind the regulations.  Def.'s Supp. Br. 4–6, 10, 13–14; All Points Supp. Br. 2–6; B3 Supp Br. 5–9.

Applying the deferential standard of review, the court finds that the OHA did not violate the law or abuse its discretion in concluding that Precise's Series A and Series B stock were distinct "class[es] of voting stock" under the regulation.  The OHA's conclusion is not contrary to law because there has been no "clear and prejudicial violation of applicable statutes or regulations."  Centech Grp., Inc. v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1333 (Fed. Cir. 2001)); Ceres Envtl. Servs., Inc. v. United States, 52 Fed. Cl. 23, 33 (2002) (quoting same); Stapp Towing, Inc. v. United States, 34 Fed. Cl. 300, 305 (1995).  As observed earlier, the SBA statute and SBA regulations are silent as to what constitutes a class or a series, or what distinguishes a class from a series.  Moreover, to the extent the OHA looked for answers in applicable state law, Maryland's corporate code is opaque in that it lends support for both the OHA's interpretation and Precise's interpretation.  Thus, the OHA did not err merely in adopting its own view.  See Femme Comp. Inc. v. United States, 83 Fed. Cl. 704, 740 (2008) ("A protestor's mere disagreement with an evaluation does not provide an adequate basis to overturn the agency's decision."); Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1351 (Fed. Cir. 2004) ("A protestor must demonstrate that there was no rational basis for the agency's determination." (quoting Impresa Construzioni, 238 F.3d at 1332–33)).

Requiring closer examination, however, is the relationship between the facts in this case and those of Precision Analytical.  The OHA is bound to follow its own precedent absent limited exceptions inapplicable here.[3]  13 C.F.R. § 134.226(a)(2) (2014).  The court will also give deference to the OHA's interpretation of its own

---

[3]      Section 134.226(a)(2) provides that "[a]n OHA decision creates precedent, unless: (i) [a]nother regulation in this chapter [13 C.F.R. §§ 101.100 to 147.670] applicable to a specific type of appeal provides that the OHA decision does not create precedent; or (ii) the decision is designated as one not to be cited as precedent."  The provision, which became effective September 20, 2010, "codif[ied] OHA's longstanding . . . practice of citing its prior decisions as precedent."  Rules of Procedure Governing Cases Before the Office of Hearings and Appeals, 75 Fed. Reg. 47,435 (Aug. 6, 2010).  "The practice . . . has been an accepted part of OHA's quasi-judicial function since OHA's inception in 1983."  75 Fed. Reg. at 47,437.

precedent, LB & B Assocs., Inc. v. United States, 68 Fed. Cl. 765, 772 (2005), provided the OHA's interpretation is rational and reasoned, see Ceres, 52 Fed. Cl. at 37.

In Ceres, for example, a bid protester challenged an SBA decision upholding a contracting officer's change of industry classification code for a contract to remove ice storm debris from a "construction" code to a "service" code. 52 Fed. Cl. at 27. The court found the code change lacked a rational basis given, inter alia, the SBA's "unexplained departure from earlier decisions" that suggested a construction code was appropriate. Id. at 34. The court explained that although the SBA-OHA was correct in noting the factual differences between the material to be removed in the OHA precedent (oily waste from ships) and the material to be removed in the subject case (vegetative storm debris from creeks and waterways), the factual distinction between the material was not dispositive. Id. at 36. Industry code designations are driven not by the type of material to be removed but by the scope of services to be rendered, such as whether the contract called merely for collection and removal of material, or also processing and destruction of that material. Id. at 36–37. Thus, the SBA-OHA should not have departed from its precedent, employing a construction code for a similar scope of work, merely by citing the difference in material without further explanation. Id. at 37. The court remanded to the SBA-OHA for a "fresh determination" of which code designation was appropriate, noting "the SBA is the best interpreter of its own regulations." Id. at 38.

Indeed, the Ceres remand reflects the well-established principle that "all administrative agencies 'have an obligation to render consistent opinions and either follow, distinguish, or overrule their own precedent.'"[4] N.L.R.B. v. Rhone-Poulenc, Inc., 789 F.2d 188, 193 (3d Cir. 1986) (quoting Chisholm v. Def. Logistics Agency, 656 F.2d 42, 47 (3d Cir. 1981) (explaining the obligation stems from the requirement that agencies not act arbitrarily or capriciously (citing 5 U.S.C. § 706(2)(A) (1976)))); see Atchison, Topeka & Santa Fe Ry. v. Wichita Bd. of Trade, 412 U.S. 800, 808 (1973) (Marshall, J.) (plurality opinion) (noting an agency has a "duty to explain its departure from prior

---

[4]      As the First and Third Circuit explain, the purpose of this "consistency doctrine" in administrative law is at least two-fold. It "prevent[s] the agency itself from significantly changing [its] policies without conscious awareness of, and consideration of the need for, change." Puerto Rican Cement Co. v. U.S.E.P.A., 889 F.2d 292, 299 (1st Cir. 1989) (citing authority in multiple jurisdictions); Greater Boston Television Corp. v. FCC, 444 F.2d 841, 852 (D.C. Cir. 1971) (observing "an agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored"). It also fosters public awareness of changes in policy, as well as effective judicial review insofar as thorough agency explanations allow a reviewing court to discern the policy served by a new procedure. N.L.R.B. v. Rhone-Poulenc, Inc., 789 F.2d 188, 194 (3d Cir. 1986) (citing Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Board of Trade, 412 U.S. 800, 805–06 (1973) (Marshall, J.) (plurality opinion)).

norms"). Therefore, "an agency changing its course by rescinding a rule is obligated to supply a reasoned analysis beyond that which may be required when an agency does not act in the first instance." Rhone-Poulenc, 789 F.2d at 194 (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto Ins. Co., 463 U.S. 29, 42 (1983)).

Accordingly, in this case the court previously found inadequate the OHA's cursory rejection of its own Precision Analytical decision and remanded to the OHA for a fresh determination and more in-depth reasoning. See Precise, 120 Fed. Cl. at 601. Now post-remand, the court finds that the OHA has outlined more clearly its basis for departing from Precision Analytical as precedent in this case. See OHA Redetermination, at *13–14. Critically, the OHA clarified that it sought not to follow or overrule Precision Analytical, but to distinguish it. See id. Further, in distinguishing it, the OHA did not attempt to distinguish Precision Analytical on the basis that it involved a different program. See id. But cf. Def.'s Mot. J. AR 18–20, ECF No. 33 (arguing this distinction). There can be no serious dispute that the ownership criteria of the SBA's 8(a) BD program, 13 C.F.R. § 124.105, and of the SBA's SDVO SBC program, 13 C.F.R. § 125.9, is comparable—or that the two programs have consonant mandates and goals—such that precedent interpreting one is likely controlling in the other. See Precise, 120 Fed. Cl. at 602. Indeed, the OHA has acknowledged that the "corresponding [ownership criteria] for the 8(a) BD program, 13 C.F.R. § 124.105(d), is worded very similarly to 13 C.F.R. § 125.9(d)." OHA Redetermination, at *10.

Rather, the OHA distinguished Precision Analytical by narrowly construing it to involve only an assessment of whether groups of stock qualified as "voting stock" for purposes of the regulation, not whether groups of voting stock qualified as separate "classes." Id. at *13 (citing Precision Analytical, at *6). Specifically, the OHA read Precision Analytical to hold merely that if a portion of an entity's stock had extremely limited voting rights (such as those mandated by state laws), that group of stock would not qualify as "voting stock" for purposes of applying the regulatory ownership criteria. See id. Based on this narrow construction, the OHA then concluded that it was not required to apply Precision Analytical as precedent in this case—that is, it was not required to engage in a qualitative analysis of whether distinctions in Series A and Series B materially detracted from the service-disabled veteran's ownership and control of the business. See id. at *14.

Although this very narrow interpretation seems handily to circumvent Precision Analytical's broader principle, see Precise, 120 Fed. Cl. at 601, the court defers—as it must—to an agency's interpretation of its own precedent when such an interpretation is rational, see LB & B Assocs., 68 Fed. Cl. at 772; Ceres, 52 Fed. Cl. at 37. Here, the court cannot say that the OHA's tightly cabined interpretation is irrational simply because it is narrow. Cf. DSE, Inc. v. United States, 169 F.3d 21, 30 (D.C. Cir. 1999) (finding in a size protest that SBA did not depart from factually distinguishable precedent because the issue in the case was whether a proffered agreement existed whereas the issue in the

preceding case was whether the agreements found to exist were entitled to present effect). A broader interpretation of <u>Precision Analytical</u> is not necessary for it to make sense. <u>Cf.</u> <u>Ceres</u>, 52 Fed. Cl. at 36 (finding that remand was appropriate because the SBA-OHA had "failed to note the broader legal application necessary for interpreting industrial classification codes which it had applied previously").

Here, consistent with the OHA's obligation to explain its policy rationale for any departure from precedent, the OHA explains why, as a matter of policy, it declined to extend <u>Precision Analytical</u> to the facts of this case. <u>See</u> OHA Redetermination, at *12–14. Hypothetically, if <u>Precision Analytical</u> were precedent, the OHA would have had to disregard any distinctions in Precise's Series A and Series B that were not meaningful (that is, did not adversely affect or dilute the service-disabled veteran's ownership or control of the entity). <u>See id.</u> at *12; <u>see</u> Pl.'s Supp. Br. 13–15, 18–21 (advocating for this approach). But the OHA viewed this approach as a problematic because it seems to conflate the ownership and control criteria; "the requirement to own at least 51% of each class of voting stock is imposed <u>in addition</u> to the other ownership and control criteria." OHA Redetermination, at *12 (emphasis added); <u>accord</u> Def.'s Supp. Br. 6–8 (arguing Precise seeks to conflate the ownership and control inquiries and render meaningless the ownership criteria); All Points Supp. Resp. 9–10, ECF No. 63 (stressing the regulations impose a three prong ownership and control test, not a two prong test). The SBA has expressly promulgated <u>separate</u> regulations pertaining to ownership and control. OHA Redetermination, at *12 (citing 13 C.F.R. §§ 125.9, 125.10). Moreover, in other prior decisions the OHA has routinely enforced these regulations as distinct, finding that if a firm failed at either the ownership or control criteria, it was not an eligible SDVO SBC. <u>Id.</u> (citing <u>Heritage of Am., LLC</u>, SBA No. VET-242, at *5); <u>IITS-Nabholz, LLC</u>, SBA No. VET-114, at *7–8)). Thus, the OHA rejected <u>Precision Analytical</u>'s inquiry into meaningful distinctions in order to prevent any blurring of the separate and distinct ownership and control requirements.[5] <u>See id.</u> at *12–13. Furthermore, the court cannot

---

[5]     The OHA also responded to an argument, purportedly made by Precise, that <u>Precision Analytical</u> should be understood to exempt a company from complying with regulatory ownership criteria if "a disadvantaged individual (or, by analogy, a service-disabled veteran) . . . retains overall ownership and control of the company," because "such an interpretation is contravened by the plain language of the underlying regulations, including 13 C.F.R. § 125.9(d)." <u>Precise Sys., Inc.</u>, SBA No. VET-246, at *14 (Apr. 30, 2015) (OHA Redetermination). The court agrees with the OHA that no entity may be exempted from the regulatory criteria. This point is a non-sequitor, however, because the OHA misinterpreted Precise's argument. Precise has not argued that <u>Precision Analytical</u> creates an exemption to regulatory criteria, nor does Precise seek such an exemption. <u>See</u> Pl.'s Supp. Br. 15, ECF No. 61; Pl.'s Supp. Resp. 9–12, ECF No. 65. Rather, Precise argued that it satisfied existing regulatory criteria based on an alternative view of what constitutes a "class" of voting stock. <u>See</u> Pl.'s Supp. Br. 15;

say that this interpretation of regulatory criteria was irrational or contrary to law because, as B3 has observed, "there is no requirement that the classes of stock maintain meaningful distinctions under the regulations." B3 Supp. Br. 9.  The SBA's focus is plainly on preserving the service-disabled veteran's undiluted ownership; the SBA does not want any group of voting stock to exist in which the service-disabled veteran does not have at least a 51% interest.  Thus, the OHA has presented a reasoned explanation for distinguishing Precision Analytical from the facts of this case.  Accordingly, the court defers to that OHA interpretation.

Next, having concluded that the OHA's Redetermination was not contrary to statute or regulations, and that Precision Analytical is distinguishable, the court turns to consider whether the OHA's assessment of Precise's ineligibility was rational and reasoned.[6]  As an initial matter, the court reiterates its earlier findings that the OHA was rational (i) in looking beyond the nomenclature to assess the true nature of differences between groups of stock; (ii) to have identified all differences between stock in the entity's organizational documents; (iii) to have turned to applicable state law to survey whether, under state law, any particular distinctions were dispositive of a "class of voting stock;" (iv) in having found state law not dispositive, to have turned to consider, as a matter of first impression, what weight to give the differences identified; and (v) in so doing, to have elected to weigh more than just differences in voting rights (in this case, differences in dividend rights, conversion rights, and redemption abilities).  See Precise, 120 Fed. Cl. at 599–600.  However, the court previously faulted the OHA for concluding—too summarily—that Precise's two series were "sufficiently dissimilar" to warrant treatment as separate classes without providing any guideposts for measuring "sufficiency."  Id. at 601–03.  The court then offered a list of potential guideposts, and remanded for reconsideration and additional reasoning.  Id.

The OHA Redetermination remedied this deficiency on remand, but not by accepting the court's invitation to consider various guideposts.  Instead, the OHA abandoned the "sufficiently dissimilar" approach, remarking that it had "not intend[ed] to establish ['sufficiently dissimilar' as] a new test for evaluating groups of stock."  OHA Redetermination, at *12.  Rather, the OHA explained, it had "meant only to convey that, given the differences between [Precise's] groups of stock, and mindful of the standard of review on appeal, it was not possible for OHA to [have found] clear error in the AD/GC's

_____

Pl.'s Supp. Resp. 10.

[6]     See Ceres Envtl. Servs., Inc. v. United States, 52 Fed. Cl. 23, 33 (2002) ("[D]eference to the SBA-OHA's decision is contingent upon an offering by the agency of a reasoned explanation for its decision which is in accord with material facts contained in the administrative record."); Y.S.K. Constr. Co. v. United States, 30 Fed. Cl. 449, 459 (1994) (explaining that the "SBA's decision must set forth its rationale with clarity, and must be justifiable on that basis").

decision." Id. In its place, the OHA Redetermination re-affirmed the OHA's conclusion that Precise's two series were separate classes, finding:  (1) the plain meaning of "common stock" and "preferred stock," supported a class distinction; (2) even if the definitions themselves were not dispositive, the two series were not "functionally equivalent" and thus should be viewed as separate classes; and (3) the OHA would not consider the materiality of those distinctions because that was irrelevant for its purposes. Id. at *9–14.

With regard to the OHA's inquiry into plain meaning, Precise argues that the OHA's reliance on definitions of "common stock" and "preferred stock," to support a finding of separate classes, is hypocritical, flawed, and unreasonable.  See Pl.'s Supp. Br. 9, 15–18.  First, according to Precise, it was "hypocritical for SBA to, on the one hand, 'disregard' Precise's use of the term 'series' in its Articles, while, on the other hand, place great weight on the Articles' use of the terms 'common' and 'preferred.'"  Id. at 9.  "What basis," Precise asserts, "does the SBA have to elevate some of the Articles' language, but explicitly and prejudicially disregard other language?"  Id.  Second, Precise contends, the definitions of "common stock" and "preferred stock" should not be dispositive in this case because "Precise's series of stock . . . [did] not align with the generic definitions of [those terms]."  Id. at 16.  Precise's preferred stock enjoyed voting rights typically unavailable to preferred stock, and, according to Precise, "the common shares' dividend rights [were] not subordinate to the preferred shares, but [were] equal, or superior, to the preferred shares."  Id. at 4.

This court disagrees with these assertions.  First, this court has already held that the OHA may consider the plain meaning of terminology that is otherwise undefined or inadequately defined in SBA statute, SBA regulations, and applicable state law.  See Precise, 120 Fed. Cl. at 599.  Second, the OHA never adopted one approach for defining "series" and "class" and another for defining "common stock" and "preferred stock."  To the contrary, it looked to the definitions of each word as a starting point for its analysis.  Third, it did not disregard any of the definitions or the language in Precise's Amended Articles.  For example, as the government points out, Precise's Amended Articles did not use the phrase "series within a class" or similar phrasing to make clear it was not establishing separate classes.  Def.'s Supp. Br. 10; see also All Points Supp. Resp. 2 (arguing "[a]n examination of the Plaintiff's corporate documents shows no direct or even indirect references to a single class of voting stock").  Further, in one instance the Amended Articles referred to Series A as a "single class."  Def.'s Supp. Br. 10 (noting that the Amended Articles at article III(c)(3)(A), AR Tab 15 at 833, provided that "the Corporation shall be entitled to redeem the [Series B] Convertible Preferred, in whole or in part, at the election of a majority of the shareholders of Series A Common voting as a single class" (emphasis added)); see also All Points Supp. Resp. 2 (arguing same).  Rather, based on those sources, the OHA concluded that the distinctions between "class" and "series" were less clear than the distinctions between "common stock" and "preferred stock."  Fourth, the OHA ultimately adopted views at odds with Precise's views, but that

does not mean the OHA erred.  See Femme Comp. Inc. v. United States, 83 Fed. Cl. 704, 740 (2008) (explaining "mere disagreement" is not sufficient "to overturn the agency's decision").

Lastly, as a factual matter, voting power is not necessarily dispositive of the common versus preferred stock distinction and while Series A ultimately may enjoy more rights and privileges than Series B, Series B does enjoy one form of preferred dividend. See Precise, 120 Fed. Cl. at 589–90 (describing same).  In any event—perhaps anticipating Precise's criticism that the definitions "ha[d] nothing to do with the 'true nature and character of the shares," Pl.'s Supp. Br. 17–18—the OHA accounted for the possibility that the definitions were not dispositive by next considering whether the distinctions between the shares were "functionally equivalent," OHA Redetermination, at *11–14; see also B3 Supp. Resp. 7–8, ECF No. 64 (arguing the OHA did not rely exclusively upon general corporate definitions).

Precise also attacks the OHA's "functionally equivalent" standard as being "equally vague" for its alleged failure to explain, or to offer guideposts for measuring, how shares must "function" in order to be "equivalent."  Pl.'s Supp. Br. 3, 8–11; Pl.'s Supp. Resp. 7.  But this argument is defeated even as it is made.  As Precise points out, "identicality" appears to be "the only benchmark elucidated by SBA/OHA."  Pl.'s Supp. Resp. 7.  Moreover, "it is hard to fathom how any variance would not violate the 'functional equivalence' criterion.  Id. at 7 n.4.  "[C]ompanies must assume that any variation between stock with voting rights (except, of course, when voting rights can be deemed 'extremely limited' in accordance with [the agency's] narrow interpretation of Precision Analytical) will be seen as establishing separate classes of voting stock."  Id. at 9.  Such a bright-line test skews in favor of finding any difference warrants treatment as separate classes.  See Pl.'s Supp. Br. 18.  Indeed, even dissimilarities that materially enhance the interests of the service-disabled veteran may support a finding of separate classes.  See id. at 2.

The court does not disagree with these criticisms generally, but Precise goes too far in asserting that the OHA Redetermination requires "identicality" in order for groups to be "functional equivalents."  There are real differences between Precise's Series A and Series B.  See Precise, 120 Fed. Cl. at 589–90 (describing differences); Def.'s Supp. Br. 9–10 (same).  The two groups of stock are not interchangeable.  For example, only the service-disabled veteran owner holds Series A stock and only the employees hold Series B stock.  Compl. ¶¶ 21–22; see AR Tab 15 at 830 (Am. Art., art. III(a)).  As All Points observes, the Internal Revenue Service also attaches a litany of limitations, privileges, and protections on any equity placed in an ESOP Trust (the Series B stock), and this litany does not apply equally to the holder of Series A.  All Points Supp. Br. 4–5; All Points Supp. Resp. 5–6.  Moreover, the Amended Articles guarantee preferred stockholders a cumulative annual dividend, whereas the Amended Articles provide variable dividends for the common stockholder that are dependent on his vote as the

majority shareholder.[7]  See Precise, 120 Fed. Cl. at 589 (discussing dividends).
Likewise, there are practical differences in conversion rights and redemption abilities.  Id.
at 590.  In sum, the differences between Series A and Series B reflect how the series
"function," and are not merely superficial or administrative in nature.  See All Points
Supp. Br. 3–6; B3 Supp. Resp. 4 (asserting that "materiality of [the three] distinctions is
evident on their face").  Thus, while Precise is correct that it is hard to fathom what
differences in rights, privileges, and limitations, for example, might exist among groups
of voting stock that would not endanger functional equivalency, it is not inconceivable
that such differences might exist.

 Nonetheless, the OHA is within its discretion to adopt a hardline approach.  In
doing so, the OHA has signaled that it does not want to engage in a case-by-case analysis
of whether differences inure to the benefit of the service-disabled veteran or someone
else, or appear to inure to one but actually inure (or could be abused to inure) to the
benefit of the other.  Thus, while the differences between Series A and Series B arguably
enhance the service-disabled veteran's interests in this case, this fact is irrelevant because
the OHA has declined to engage in any qualitative analysis of the differences between
stock with clear voting rights.

 Furthermore, the court rejects Precise's assertion that a decision by the court
affirming the SBA's interpretation will "ensure[] that the AD/GC and OHA have aimless
and unfettered discretion to construe any perceived variance between shares of stock as
constituting separate classes of voting stock because they deem them not 'functionally
equivalent.'"  See Pl.'s Supp. Resp. 8; see also id. at 14 ("The 'functionally equivalent'
standard therefore provides competitors a fishing license to troll for perceived variances
between the shares of an SDVOSB held by its [service-disabled veteran] and [non-
service-disabled veteran] owners.").  The court does not sanction, nor expect, that the
rubric adopted herein will lead to "aimless and unfettered [agency] discretion."  First, the

---

[7]  Precise argues that despite Series B's so-called "preferred dividend," the Series A
shareholder actually enjoys a superior dividend preference by virtue of the Repayment
Dividend.  Pl.'s Supp. Br. 4, 16–19; see Precise Sys., Inc. v. United States, 120 Fed. Cl.
586, 589 (2015) (explaining dividends).  All Points counters that Series B's preferred
dividend is, in fact, preferred because the Series A Repayment Dividend, which may
issue earlier, is not a dividend in the traditional sense of "new value or earnings"—it
merely reimburses the service-disabled veteran for funds he lent to the entity to establish
the ESOP.  All Points Supp. Resp. 5, ECF No. 63; accord Def.'s Supp. Resp. 5, ECF No.
66.  However, the court need not resolve this dispute.  As B3 argues, it ultimately should
"not matter that, as Precise argues, one grouping's dividend preferences are superior to
another's."  B3 Supp. Resp. 7, ECF No. 64.  Under the OHA's decision rubric, it is the
difference itself that "underscores the fact that [the series] constitute two separate types
of stock."  Id.

SBA will be constrained by what variances actually exist between stock in an entity's organizational documents.  Second, the SBA will enjoy very little discretion to weigh the variances it identifies because the SBA's hardline functional equivalency test all but ensures separate classes will be identified.  Lastly, while it may be true that any entity adopting a capitalization system with many variables will run a greater risk of "class" distinction, the court cannot say that this greater risk is contrary to law or irrational.

In sum, the thrust of Precise's argument is that since both Series A and Series B vote on the same issues, and are given essentially the same voting rights, they represent a single "class of voting stock."  Alternatively, the differences between the series in dividend rights, conversion rights, and redemption abilities are not meaningful and, therefore, can be disregarded for purposes of ownership analysis.  Nothing in this opinion should be construed to hold that Precise's interpretation is contrary to law and not itself rational and adequately reasoned.  For example, the court does believe that either the regulatory histories of the 8(a) BD Program and SDVO SBC program, or Maryland law, squarely favor or preclude either side's arguments.  Likewise, the OHA could have elected to distinguish "class[es] of voting stock" based on differences in voting rights among the stock, as argued by Precise, and such an approach might itself have been rational.  Indeed, had the OHA agreed with Precise and adopted Precise's interpretation, the court might have affirmed that version of an OHA decision.  But in this instance the OHA ultimately disagreed with Precise and adopted an approach at odds with Precise's interpretation.  Since the interpretation the OHA ultimately adopted was itself in accordance with law, rational, and reasoned, the court must now affirm it as well.

III.    Conclusion

For the reasons set forth above, the court **AFFIRMS** the SBA's determination that Precise was ineligible for SDVO SBC status at the time of its offer on the procurement;[8] **GRANTS** the Cross-Motions for Judgment on the Administrative Record filed by defendant United States, ECF No. 33, and defendant-intervenors All Points Logistics, LLC and B3 Solutions, LLC, ECF Nos. 32, 34; and **DENIES** the Motion for Judgment on the Administrative Record filed by plaintiff Precise Systems, Inc., ECF No. 30.  The Clerk shall enter judgment accordingly.

IT IS SO ORDERED.

 s/ Patricia E. Campbell-Smith
PATRICIA E. CAMPBELL-SMITH
Chief Judge

---

[8]    With respect to future procurements, see supra note 2.